BALL'S ADMINISTRATRIX *vs.* BALL ET AL.

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT.

Where a mortgage has been raised and cancelled under defective powers, by the attorney in fact, yet when it has been actually cancelled under them, and a direct release by the mortgagees is subsequently made, purchasers will be fully protected by it.

This court will not travel out of a bill of exceptions to notice objections which were not made in the court below. Had they been suggested there, they might have been removed.

Where a curator of an interdicted person is shown to have been regularly appointed, and has acted and been recognized by the Probate Court as exercising the office, he will be presumed to have taken the necessary oath, although none is found in the record; and his authority and acts will be deemed valid.

The oath to be taken by a curator, is an important formality not to be dispensed with ; but when all the other proceedings had for the alienation of minors' or insane persons' property have been conducted with the fidelity an oath was intended to secure, purchasers will be protected under them, even if no oath be found.

This is an action of partition, instituted by the widow and administratrix of Jonathan Ball, deceased, for one undivided third part of a piece of ground situated in the Second Municipality of the city of New-Orleans, called the "Rope Walk," which was the joint property of the partners of Jonathan Ball & Co.; a firm composed of Jonathan Ball, Erastus Ball, and L. C. Ball.

There was a sale of the property ordered to effect a partition, and N. B. Le Breton, P. A. Roste, H. F. Deblieux, and L. Janin, became the purchasers on the 9th of May, 1836, for one hundred and eight thousand dollars; one third payable in cash, and the balance in notes at six and twelve months. The property it seems originally belonged to Russell Ball, who died, leaving his father, mother, and brothers and sisters his heirs. By an act under private signature, dated the first of August, 1831, the other heirs sold their interest in this property to the firm of Jonathan Ball & Co., composed of Jonathan, Erastus, and L. C. Ball. In this sale, Lemuel Ball, the father, appeared not only as selling his own share, but also that of Clarissa Ball, his daughter, *an insane person*, and styles himself her guardian, and affirms that he is authorized to act in her name by proper authority. In this sale the vendors reserved a mortgage to secure the payment of twenty-one thousand three hundred and thirty-five dollars, with six per cent. interest; which mortgage was not raised when the sale for a partition was made. To cure the supposed defects in the authority of her father to sell her share, Clarissa Ball's brother, Erastus Ball, instituted proceedings in the Court of Probates, had her interdicted as an insane person, and was regularly appointed her curator, and had her share resold in April, 1837, which was bought in by the purchasers at the same rate which her interest bore to the original price, viz : nine thousand dollars for her twelfth part.

The purchasers still refused to comply with this sale, and to allow the notes previously deposited to be given up.

The original parties to this suit took a rule on Le Breton and the other purchasers, to show cause why they should not give up said notes and comply with the terms of sale. The defendants, in answer to the rule, denied their liability, because the plaintiffs had neglected to raise the mortgage, and to cure the defects in the title. They contended that as these defects did not affect more than one-third of the value of the property, they would only retain one-third of the price.

The rule was, however, made absolute, and the defendants therein appealed.

*Preston* for the plaintiffs and appellees, insisted on the affirmance of the judgment, with costs and ten per cent. damages for the delay and injury occasioned thereby.

*L. Janin*, for the appellants, contended that the mortgage was not legally raised. The appellees produced indeed a release by Erastus Ball, dated April 10, 1837, by which he raised the mortgage as the attorney in fact of the other heirs by virtue of two powers of attorney, dated the 18th and 31st of January, 1834. These powers of attorney were produced, but they do by no means authorize him to raise this mortgage.

1. He was not specially empowered to raise this or any other mortgage, and a special power is required for this purpose. *Louisiana Code* 2966.

2. The power was a general one to settle the *business of R. Ball's estate.* As regards this mortgage, Erastus Ball himself was one of the persons who owed it; he could not use the power of attorney of his constituents to release himself from a debt he owed to them. *Beal* vs. *M'Kiernan*, 6 *Louisiana Reports*, 415.

3. Even if he had been specially authorized to release mortgage, this release would have been invalid, for it was gratuitous in regard to his constituents, who received no consideration for it. *Paley*, 222.

4. One or all of these powers of attorney were joint and several to Erastus and L. C. Ball, one being authorized to act singly in the case of the absence or inability of the other; and L. C. Ball's absence or inability are not shown.

To remedy these obvious defects, the appellees produced at the trial a paper, of which the appellants had no previous knowledge whatever. This purports to be a release of the mortgage, under private signature, in favor of J. Ball & Co., "against a tract of land and improvements, denominated the Rope Walk," executed on September 3, 1835, and not certified.

The hand-writing of the signers was proved by a comparison of hand-writings. The appellants took a bill of exceptions to this mode of proof. An instrument of such a suspicious character (for the debtors themselves acknowledge that the mortgage had not been paid long after its date) ought certainly not to be admitted without great caution. It is not certified; a precaution which is rarely omitted in a document executed at the North, for the purpose of being used here. It was for the first time thrust upon the appellants at the moment of the trial; it was not used in the previous attempt to raise the mortgage. Moreover, the experts did not verify the hand-writing by a comparison with the signatures of the parties to a document admitted to be genuine; but they came to the conclusion stated, because the hand-writing resembled that of the same parties to acts deposited in the office of a notary public in this city, and attested by the governors of Vermont and New York. Thus this proof was arrived at by a most circuitous route.

In some other document, the certificate of a Vermont justice of the peace attests the signatures; his own is certified by the governor; the governor's is taken for granted; and those signatures believed at second and third hand, are the guides of the experts, who decide after a hasty glance.

But the experts fortunately state the grounds of their belief; and it thus clearly appears that the evidence is not legal. They state that they have compared the document in question with *others deposited in the office of W. Y. Lewis*, which are duly legalized. But the originals of these "duly legalized documents" are not in evidence; and though the court was bound to recognize the signature of the governor, still it was not bound to take it for granted, upon the statement of the witnesses, that these documents were duly legalized; nor do these witnesses state in what manner those documents were legalized, and what documents they were. These original documents ought at first to have been given in evidence, and been recognized by the court as establishing the genuineness of the signatures affixed to them. Then the question would still have arisen, whether the governor cer-

tified;more than the signature and official capacity of the justice, and the justice more than the acknowledgment of the signers; that acknowledgment, whether true or not, whether the names were written by those that bore them, or by others for them, would be equally binding upon them, without clearly showing that the names were written by themselves; for this is not the principal object of the acknowledgment.

Lastly, as regards the *effect* of this release, the property is described in it in a manner which is wanting in the certainty, as requisite in the cancelling as in the granting of a special mortgage. "A tract and improvements denominated the Rope Walk." What identifies this with the property mortgaged by the plaintiff, or bought by the defendants in the rule? *Louisiana Code*, 3273.

The sale by order of the Court of Probates is void, and therefore does not cure the defect in the first sale.

It was not preceded by a legal inventory. An inventory was indeed made on December 20, 1836, and Erastus Ball appeared in it as curator, but it appears from his petition of the 31st of December, 1836, in which he prays for letters of curatorship, on giving proper security, that when the inventory was made he was not duly qualified. And it appears from articles 402 and 329, of the *Louisiana Code*, that though the curator of an interdicted person, as well as the tutor of a minor, may give security after the inventory is made, still he must have been previously appointed by the court. An inventory without the presence of the curator, is a nullity.

All the proceedings in the Court of Probates are radically null; for the curator *never took an oath.* There are no letters of curatorship, no oath in the record, although it is a complete transcript of all the proceedings had, and all the documents on file. The appellants beg leave to affirm that they have lately verified that the curator never was sworn, and that the absence of his oath is not a mere omission in the transcript.

*Morphy, J.*, delivered the opinion of the court.

Russell Ball died in New-Orleans some years ago, leaving

among other property a tract of land in the rear of the faubourg Annunciation, called his rope-walk. His heirs at law were his father and mother, his brothers and sisters, living in the northern states. They passed a private sale of their interest in said tract of land to the mercantile firm of J. Ball & Co., in this city; said firm being composed of Jonathan Ball, Erastus Ball and Levi Ball. The firm being subsequently dissolved by the death of Jonathan Ball, his widow, Delana Ball, in her own name, and as tutrix of her minor children, brought suit for the partition of the rope-walk, against the surviving partners. At the public sale made to effect this partition, the appellants became purchasers of the property for the sum of one hundred and eight thousand dollars, payable part in cash, and the balance at certain terms of credit. The purchasers having made objections to the title, it was agreed between the parties that the sale should nevertheless be executed to them by the sheriff, that the cash should be paid immediately; but that the notes should remain deposited in the Bank of Louisiana, until the defects pointed out in the title should be cured. Those defects arose from a mortgage existing against the vendors for twenty-one thousand three hundred and thirty-five dollars, the purchase money yet due to the heirs of R. Ball; and from the informal sale to the firm of J. Ball & Co., of an undivided twelfth portion of the property which belonged to one of said heirs, Clarissa Ball, an insane person. Her interest had been conveyed by her father, Lemuel Ball, styling himself her legal guardian; but no evidence had been given of his said capacity, and none of the formalities complied with that are required by our laws for the alienation of property belonging to persons in that situation. By a subsequent agreement, the purchasers consented to retain only one-third of the price for their security, until the vendors had complied with their undertaking to perfect the title.

To cure the defects complained of, Erastus Ball instituted proceedings in the Court of Probates for the interdiction of Clarissa Ball, was appointed her curator, and had her share in this property sold, when the appellant bought it at the

same rate which her interest bore to the original price, to wit, nine thousand dollars for her twelfth. The purchasers still persisting in their refusal to allow the notes previously deposited to be delivered over to the vendors, a rule was taken on them to show cause why such delivery should not take place. The judge below made this rule absolute, and the purchasers appealed.

They have assumed in this court two grounds on which they rest their resistance to the rule taken on them.

1. That the mortgage in favor of the heirs of R. Ball has not been legally raised.

2. That no oath appears to have been taken by the curator appointed to Clarissa Ball, in the proceedings under which the sale of her property was effected.

I. On the trial of the rule below, the appellees produced a release of the mortgage of twenty-one thousand three hundred and thirty-five dollars, executed by Erastus Ball, acting under two powers of attorney of the other heirs to him. It is said that these powers did not sufficiently authorize him to raise this mortgage, and a number of defects supposed to exist in these documents have been pointed out. Admitting these powers to be liable to some of the objections urged by the appellants, yet we are of opinion that inasmuch as the mortgage has been actually raised and cancelled under them, the purchasers are fully protected by the direct release subsequently given by the mortgagees themselves to the firm of J. Ball & Co. The signatures to this last instrument not being certified in due form, were permitted by the judge below to be proved by comparison of hand-writing with other signatures of the same parties duly legalized and deposited in the archives of W. Y. Lewis, notary public. This was opposed on the ground that the signatures being expressly denied by the appellants, they should be proved by witnesses who had seen the parties write. We think the judge did not err. *Louisiana Code*, 2241. *Code of Practice*, 325. 2 *Martin*, 203. 3 *Idem.*, 359. But it is now urged in this court, that the certified papers with which these signatures were compared, were not brought into court or given in evidence;

*Where a mortgage has been raised and cancelled under defective powers, by the attorney in fact, yet when it has been actually cancelled under them, and a direct release by the mortgagees is subsequently made; purchasers will be fully protected by it.*

EASTERN DIST.
April, 1840.

BALL'S ADM'X.
vs.
BALL ET AL.

This court will not travel out of a bill of exceptions to notice objections which were not made in the court below. Had they been suggested there they might have been removed.

and that although the court were bound to recognize the signature of the governor certifying them, still they could not take it for granted, upon the statement of the witnesses or experts, that in fact these documents were duly certified. There may be something in this objection, but the bill of exceptions which we find in the record is not taken on the ground that the signatures at the notary's office were not genuine, or properly attested, but on the sole ground that the signatures to the direct release given by the heirs of Ball being denied, could only be proved by witnesses. The rule is well settled, that this court will not travel out of the bill of exceptions in order to notice objections relied on here, which were not distinctly made below and fully stated in it. Had this objection been raised in the court below, it could easily have been removed by bringing before the judge the certified documents examined by the experts.

II. The want of an oath on the part of the curator of Clarissa Ball, is the other ground relied on. It is said that this informality avoids all the proceedings in the Court of Probates under which the sale of her share in the property had taken place, and leaves the title as defective as it was before. We have carefully examined these proceedings of which a certified transcript had been given in evidence below by the appellees. They appear to be regular in every respect, except that the oath of the curator is no where mentioned in this transcript; but from this circumstance must we necessarily believe that in fact no oath has been taken? We find in the transcript that E. Ball was designated by a family meeting to be the curator of his insane sister, Clarissa Ball; that he was appointed to that office by the judge of probates; that he gave security according to law, and that throughout all the proceedings which preceded the judgment decreeing the sale, he was recognized by the Court of Probates as her curator; and acted in all these proceedings contradictorily with an attorney appointed by the judge to be her curator *ad lites*. Article 402 of the *Louisiana Code* provides that all its provisions in relation to the duties and formalities prescribed for the appointment and administration of tutors apply to the

EASTERN DIST.

*April*, 1840.

BALL'S ADM'X.
*vs.*
BALL ET AL.

curators of interdicted persons; and article 328 declares that tutors are to take their oath prior to their entering upon the exercise of their duties. With these provisions before us, can we believe that Erastus Ball would have been recognized and permitted to act as curator throughout all these proceedings, in the Probate Court, had he not previously taken his oath of office. The order which we find in the record for the delivery to him of letters of curatorship on the sole condition that he should give security according to law, precludes the idea that he had not already complied with all the other legal requisites, the very first of which was the taking of his oath. We must believe that the positive precepts of the law are obeyed in our courts, and all that we find in the record creates in our minds a stronger presumption that an oath has been taken by this curator, than the contrary one, which may be inferred from the absence of any mention of it in the transcript before us. The oath might have been mislaid in the Court of Probates, and if not mislaid, might have been omitted in the transcript. It should seem from the judgment under review that no question was made below as to this oath not having been taken, for the judge states it to have been admitted that the defect in the title was cured, and pronounced only on the legality of the powers under which the mortgage was raised.

*Where a curator of an interdicted person, is shown to have been regularly appointed, and has acted, and been recognized by the Probate Court as exercising the office, he will be presumed to have taken the necessary oath, although none is found in the record; and his authority and acts will be deemed valid.*

In suits like the present, and all those arising under article 2535, when payment is resisted by a purchaser on the plea of a just reason to fear a disturbance by an action of mortgage or revendication, the courts are placed in the singular and somewhat awkward obligation of pronouncing on the rights of persons not before them; of deciding on difficulties which may never be raised by the only party interested; and of declaring in some manner what would be their decision in a future suit that might be brought on account of the irregularity or defect in a title which furnishes the alleged just reason to fear a disturbance. If, independent of any legal question and the inconvenience of having a title which may not be considered free from any defect, the just reason to fear a disturbance were to be judged of by the degree of probabil-

EASTERN DIST.
*April*, 1840.
───────────
BALL'S ADM'X.
*vs.*
BALL ET AL.

ity of any claim being set up on account of such supposed defect, it might safely be advanced, that in this case there is not the least reason to apprehend any future disturbance. The property which in 1831 was sold by the heirs of R. Ball for twenty-one thousand three hundred and thirty-five dollars, brought, in 1836, the enormous sum of one hundred and eight thousand dollars. Thus, by the probate sale, Clarissa Ball is to receive for her share the sum of nine thousand, instead of one thousand seven hundred and seventy-eight dollars; which is the amount that she, in common with her co-heirs, would have received had her interest been legally divested by the first sale. This price, which was obtained at a time when the rage for speculation in lands knew no bounds, is of itself ample security against any claim by reason of any supposed irregularity in the sale of this insane person's interest in the property. If, in addition to this, it is considered that other natural and lawful heirs are themselves the vendors of this property, and therefore bound in warranty towards the appellants, it must be admitted that in point of fact, the latter can have no just reason to fear a disturbance. But leaving out of view the considerations of fact which in the present case render extremely improbable any disturbance on the part of Clarissa Ball or her heirs, let us examine what would be the prospect of a suit brought hereafter by them against the present purchasers or their future vendors. Could this sale be disturbed because the oath of the insane person's curator should not be found in the Court of Probates; when all the proceedings would appear to have been fairly conducted, and to have been beneficial to the interdicted person? We think not. The holders of this property, or any part of it, would successfully appeal to the decisions of this court, in which it has been adjudged that purchasers at a sale made under the decree of a court of competent jurisdiction, are not to inquire into, or be responsible for, the proceedings which preceded the decree, and are not bound to look beyond the decree itself. *Michel's Heirs* vs. *Michel's Curator, and others,* 11 *La. Rep.* 149. *Lalanne's Heirs* vs. *Moreau,* 13 *Idem.,* 432.

But it is said that these decisions do not apply to a case like the present, because no oath being shown to have been taken by the curator of the interdicted person, she was not represented at all in these proceedings, and that they are as invalid and void as if they had been conducted by an utter stranger. We cannot believe that a person chosen by a family meeting of the insane, and appointed curator by a competent court, who has given security for his good administration, and has in every other respect complied with the requisites of the law, can be viewed in the light of an utter stranger, for the sole reason that he has not taken an oath, or that none can be found. The oath prescribed by law to be taken by tutors curators, executors, &c., is justly considered as an important formality not to be dispensed with. Its object no doubt was to impress these functionaries with the sacredness of the trust confided to them, and to afford additional security for their good administration ; and courts should be extremely attentive in taking care that this requisite be complied with. But when proceedings are had with a view to the alienation of the property of minors, interdicted persons, or of a succession, when they have been legally conducted in every other respect, and with that fidelity that the oath was intended to secure, we can see no good reason why the above cited decisions should not apply to this as well as any other informality that might exist in the proceedings that preceded the decree ordering a sale. A contrary rule to that laid down in those decisions, would eventually operate to the injury of all minors and interdicted persons; for no one would dare to purchase their property when offered for sale, if the omission or want of proof of any of the multifarious and minute formalities prescribed for the government and administration of their concerns, could subsequently authorize a revendication of the property sold ; although every substantial requisite should have been complied with, and the sale should have been decreed by a court of competent jurisdiction.

*The oath to be taken by a curator is an important formality not to be dispensed with ; but when all the other proceedings had for the alienation of minor's or insane person's property, have been conducted with the fidelity an oath was intended to secure, purchasers will be protected under them, even if no oath be found.*

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.