Zeigler vs. His Creditors.

## No. 12,171.

### S. J. ZEIGLER VS. HIS CREDITORS.

Attorney's fees stipulated in a mortgage to be paid in case of non-payment of the debt at maturity are due when the mortgagee is bound to employ counsel to collect his claim, and such counsel represent him in the succession proceedings. Mullan vs. Creditors, 39 An. 397.

The sale in a succession of property on which there are mortgages, and the payment of the proceeds of sale into the hands of the administrator do not stop the running of interest on the claims. Interest runs on each claim until paid. Caldwell vs. Creditors, 9 La. 265; Bronson vs. Baker's Creditors, 1 La. 409; Smalley vs. Creditors, 3 An. 386; Blouin vs. Liquidators of Hart & Hébert, 30 An. 716.

If a person who marries again has children of his or her preceding marriage he or she can not dispose of the property given or bequeathed to him or her by the deceased spouse, or which came to him or her from a brother or sister of any of the children who remain. This property by the second marriage becomes the property of the children of the preceding marriage, and the spouse who marries again has only the usufruct of it. Art. 1753 C. C.; Scott vs Doremus, 10 An. 679; Succession of Hale, 26 An. 201.

Property so held by a surviving husband reverts by his second marriage, notwithstanding the alienations which he may have made when holding under his defeasible title, and the property returns free from all mortgage and incumbrances. C. C. 484, 548, 732, 739, 1342, 1503, 1521, 1522, 1555, 1558, 3268.

Where a surviving husband transfers an interest in a piece of property which had been bequeathed to him by his wife, to a third person, and such third person provokes subsequently a partition by licitation of the property between himself and his vendor, and at such sale the vendor becomes the purchaser, matters stand as to the effect of the reversion of the property by the second marriage as if the property had been always held by the original title.

Where a piece of property is held in indivision between a surviving husband (holding an interest thereon under a legacy from his deceased wife, also an *independent interest elsewhere acquired*) the children of such surviving spouse, and a third person, and such third person provoked a partition by licitation of the property at which the father bought, he acquired a valid title to the whole, notwithstanding there was an error at the time of the sale as to the extent of the interest of the various joint owners by reason of the fact that the portion of the interest held by the father from his wife, and then by reason of his second marriage reverted to his children. The minors were in court as defendants through special tutors, and the parties litigating were in reality all joint owners. The only effect of the error would be that in the ultimate partitioning or division as between the father and his children he would be chargeable toward the minors for the amount of their actual interest in the property.

Where a community is dissolved by the death of the wife, separate creditors of the husband acquire rights upon community property subordinate to the rights of the community creditors. Ealer vs. Lodge, 36 An. 117.

Where the community being indebted to the wife for paraphernal funds received by the husband and used for the benefit of the community—the wife dies—her claim passes to her minor children as their property; the subsequent appointment of their father as their tutor does not have the effect of altering the char-

Zeigler vs. His Creditors.

acter of the claim from one due to them by the community into one due them by their tutor. McCall vs. Mercier, 1 La. 347.

The liquidation of the community can not be operated by making a comparison, at any given date, of the value of the community property with the amount of a claim due by the community to the wife's heirs, and by assuming upon this comparison's showing that the community claim exceeded the value of the entire property (or one-half thereof); that therefore a d as resulting from that fact the wife's heirs have become vested in the absolute ownership of either the whole community property or one-half thereof. The legal title to the property does not shift by a mere comparison of values.

Where, at the time a surviving husband makes a cession of his property, the community between himself and his deceased wife remains unsettled (owning property and owing debts), the insolvent should place the community property (described as such), and in its entirety, upon his schedule and classify the creditors into community and separate creditors to the end that the property of the community be sold separately from the separate property, and its proceeds disposed of according to the rights of parties. The community should be liquidated inside of the insolvency. Succession of McLean, 12 An. 222.

When the legal mortgage in favor of a minor has been canceled and erased from the records by the final decree of a court seized with jurisdiction thereof in proceedings regular on their face, and with the advice and consent of a family meeting, a special mortgage has been substituted therefor, subsequent purchasers in good faith of the property will be protected by the decree. Golding vs. Golding, 43 An. 555.

In order that the property of a tutor be affected with a tutorship mortgage, the fact of the tutorship and the name of the tutor must appear of record.

Where a tutor holding an undivided interest in real estate purchases the entire property at a judicial sale made in partition proceedings, a tutorship mortgage affecting at the time of the sale of the tutor's undivided interest in the property remains unaffected by the sale.

MILLER, J., on application for rehearing. The ordinary creditor paying the debt of the mortgage creditor is subrogated of right to the mortgage. Civil Code, Art. 2160; Boillieux, 4th Vol., p. 544; 4 Marcade, p. 585; 7 Duranton, p. 94; Napoleon Code, Art. 1251.

When the proof administered fails to show ownership of the note by purchase, as alleged in the petition, but does show ownership by the subrogation accomplished by payment, the party will be allowed the benefit of the subrogation. 11 Martin, 26; 12 Martin, 242; 18 La. 328; 9 An. 534.

A PPEAL from the First Judicial District Court for the Parish of Caddo. *Taylor, J.*

*A. H. Leonard, F. G. Thatcher* and *D. T. Land* for Syndic, Plaintiff, Appellant; *A. H. Leonard* for Merchants and Farmers Bank, Opponent, Appellant; *Farrar, Jonas & Kruttschnitt* and *Leonard & Randolph* for S. Levy, Jr., Opponent, Appellant; *Alexander & Blanchard* for Mrs. M. F. Smith, Opponent, Appellant; *Wise & Herndon* and

10

Zeigler vs. His Creditors.

*Howe, Spencer & Cocke* for First National Bank of Shreveport, Opponent, Appellant; *Thigpen & Foster* for S. G. Dreyfous & Co., Opponents and Appellants.

*T. F. Bell* for Mary Lee and Vinnie Zeigler, Opponents and Appellees.

Argued and submitted June 3, 1896.

Argued and submitted on application for rehearing November 20, 1896.

Opinion handed down on application for rehearing January 4, 1897.

Rehearing refused January 4, 1897.

Opinion handed down June 22, 1896.

On October 24, 1892, S. J. Zeigler applied for a respite to the District Court of Caddo, where he resided. The respite was granted, but the debtor, failing to comply with its terms, was forced to make a cession of his property.

On the 30th of July, 1894, the District Court of the parish ordered that all the real estate belonging to the estate be sold according to law, on the terms and conditions fixed by the meeting of creditors held on July 14, 1894, before the district clerk, *ex-officio* recorder and notary public.

On the 8th December, 1894, George E. Gilmer, as under-tutor of the minors Mary Lee and Vinnie Zeigler, issue of the marriage of S. J. Ziegler with his deceased wife Sallie Vance, presented a petition in which he averred that S. Levy, Jr., and L. M. Carter, syndics of S. J. Zeigler, acting under the aforesaid order of court, had advertised for sale, as the property of Zeigler, certain property situated in the parish of Bossier, to-wit: an 83-128 interest in and to a lot in the town of Benton, which he described; an undivided 83-128 interest in a certain one-acre lot in the town of Benton, which he described; an undivided 83-128 interest in and to an undivided half interest in the north half and the north half of southwest quarter and northwest quarter of southeast quarter and west half of northeast quarter of southeast quarter of section 6, less forty acres sold Sam Stroy, and in and to southwest quarter of section 8, township 21, range 13, and

east half of northeast quarter of section 1, township 21, range 14, in all 680 acres, known as the "Lewis lands;" also an undivided 83-128 in and to an undivided half interest in and to the east half of southeast quarter of section 23 and west half of southwest quarter of section 24 and south half and west half of northwest quarter of section 25, township 22, range 14, containing 560 acres, known as "Dutch John Hill lands." He averred that Zeigler in reality owned only an undivided half interest in said lands, the other undivided half being the property of the minor children of Zeigler, they inheriting the same from their deceased mother.

That said syndics have advertised for sale an undivided one-ninth interest in section 28, township 20, range 13, less southeast quarter of southeast quarter of said section, and that Zeigler has no interest therein, but it belongs to the minors by inheritance from their mother; that they have also advertised for sale the south half of "Buck Hall plantation," viz.: that part of section 24, township 19, range 14, and that part of sections 19 and 20, township 19, range 13, lying south of an east and west line commencing on the bank of Red river, in section 24, township 19, range 14, 331 1-3 links north of the quarter-section corner between sections 19 and 24, running east through fractional section 24 and sections 19 and 20 to a corner on west bank of William bayou, containing 376 acres, more or less.

He averred that said minors own an undivided half interest in said last described land by inheritance from their mother. That said syndics have also advertised for sale all the right, title and interest of said creditors as assignees of S. J. Zeigler in and to the southwest quarter of section 2; southeast quarter and east half of southwest quarter of section 3; section 10, west half of southwest quarter of section 11; northwest quarter and south half of southwest quarter of section 22, township 20, range 13, contianing about 2160 acres, known as "Plain Dealing," less all blocks and lots in town of "Plain Dealing" sold heretofore by S. J. Zeigler, and less all portions of said place heretofore sold by him. He averred that the whole of said last described land belonged to said minors by inheritance from their mother. He averred that though Zeigler was the confirmed natural tutor of the said children he had an interest in the premises in opposition to the minors, and that it was necessary for him as under-tutor to represent them. He prayed to file his opposition, and that after due proceedings there be judgment setting

aside the order of sale so far as it concerned the above alleged interest of the minors, and declaring them to be the owners of the property, as set forth in the opposition.

On the same day the under-tutor filed an opposition on the part of the minors, alleging that the syndics had advertised for sale as the property of Zeigler the following described real estate situated in Caddo parish, to-wit: an undivided 19-128 interest in lots Nos. 9, 10, 11 and 12, block 62, in the city of Shreveport, which property belongs to said minors. That said lots and improvements thereon belonged to the community between Zeigler and his deceased wife, and that Zeigler, the father, owned only an undivided half interest therein, but that Zeigler surrendered to his creditors as his property an undivided 83-128 interest in said property, whereas he only owns an undivided half interest, the remaining undivided half interest being the property of said minors, a part of which, as above set forth, is advertised for sale as the property of Zeigler. That said syndics had advertised for sale as the property of Zeigler that part of the plantation known as "Buck Hall," which is situated in Caddo parish, whereas Zeigler only owns an undivided half interest therein, the remaining half belonging to the minors. Said property belonged to the community between Zeigler and wife, and on the death of the wife her half interest vested in said minors.

That said syndics had advertised for sale as the property of Zeigler the following described land situated in Caddo parish, to-wit: The west fractional half of section 25, the northwest fractional quarter of section 36, the east half of southwest quarter, the southeast quarter of section 26, northeast fractional quarter and east half of west half of section 35, township 19, range 14, less 153 acres sold to L. P. Haynes. He averred that said minors became the owners of an undivided one-eighth interest in and to said last described land by virtue of the last will of William Haynes, deceased, and that after the death of Haynes, and during the existence of the community between their father and mother, their father acquired by purchase four-fifths of one-half of said land, and that one-half of this community interest became vested in said minors on the death of their mother, making their interest in said land an undivided thirteen-fortieths; that he filed the opposition as under-tutor for the minors for the reason that their father, who was their tutor, had an interest in the premises in opposition to that of the minors. He prayed that

the minors be decreed to be the owner of the property, as set forth, and that the order of sale be set aside in so far as it concerned the interest of said minors therein.

The syndics answered these oppositions, pleading to the opposition bearing upon the sale of the property in Bossier parish first a general denial. They admitted advertisement of the lots in old Benton. They admitted that the 630 acres known as the Lewis lands and the 560 acres known as the Dutch John Hill lands were purchased by Zeigler during the life of his first wife, Sallie Vance, the mother of the minors represented by Gilmer as under-tutor, and that at her death her undivided half interest vested in her children and the other half in their father, but they averred that his first wife at her death left four minor children, of whom two died, and from whom their father inherited, and averred that his interest in said property when it was surrenlered was nine-sixteenths and that of the minor opponents seven-sixteenths. They averred that the minors had no interest as owners in the south half of Buck Hall plantation, and had none when their father surrendered it. That the entire interest of the minors in said property was divested by a sale of the same made by their tutor under advice of a family meeting duly held and duly homologated by the court of their domicile, which sale was made to S. W. Vance, from whom Zeigler subsequently acquired it. They averred that the minors had no interest in the 2160 acres of land known as Plain Dealing, and that any interest said minors may have had was divested by a judicial sale made in the suit of W. C. Perrin vs. S. J. Zeigler *et al.* on the docket of the District Court for Bossier parish, in which suit the minors were parties and appeared.

The syndics pleaded to the opposition touching the sales advertised to be made in Caddo parish first a general denial. They admitted the advertisement for sale, as averred, of an undivided eighty-three-one hundred and twenty-eighth interest in lots Nos. 9, 10, 11 and 12, Block 62, city of Shreveport, with the buildings and improvements thereon, as property surrendered by Zeigler. They admitted that said property was acquired by Zeigler during the lifetime of his first wife, the mother of the opponents, and that at her death the mother's half vested in her children and the other half in the father, but they averred that the first wife left at her death four minor children, of whom two had died, from whom their father inherited, and that his interest in said property when it was surren-

dered was nine-sixteenths and that of the minor heirs seven-six-teenths.

They admitted they had advertised for sale, as part of the prop-erty surrendered, that part of Buck Hall plantation, which was situated in Caddo parish, but they averred that when Zeigler surren-dered it he owned it all, and the minors had no interest therein. That the interest of the minors therein was divested by a sale of same, made by their tutor, under advice of a family meeting duly held and homologated by the court of their domicile, which sale was made to L. W. Vance, from whom Zeigler subsequently acquired it. They admitted the advertisement of the property known as the Haynes place, less one hundred and fifty-three acres, but averred that the minors had no interest therein as owners. That after the death of their mother, a suit was instituted by a person owning an undivided interest in said land for a partition. That said minors were duly made parties to said suit, and appeared therein. That a decree was therein rendered decreeing the sale of said property to effect a partition, under which decree said property was sold and any interest therein held by said minors was divested. The minors, Mary Lee and Vinnie Zeigler, having been emancipated, made themselves parties to the oppositions filed by their under-tutor and adopted his allega-tions.

On the 20th February, 1895, the syndics filed a tableau of debts.

Mrs. M. F. Smith filed an opposition, claiming to be a privileged creditor of the insolvent. She opposed "on the ground that in addition to the amounts in said tableau for debt and interest on her mortgage note, and the amount paid by her for taxes on the prop-erty mortgaged to her, she was entitled to be placed on said tableau for the additional sum of four hundred dollars for attorney's fees as stipulated in her act of mortgage. She further claimed to be ranked on said tableau as a special privileged creditor on the fund realized by the sale of the two pieces of property upon which her mortgage rests, to-wit: the sum of nine thousand seven hundred and fifty dollars, to be paid by preference out of said proceeds the full amount of her mortgage debt, interest and attorney's fees and taxes, by preference over all other debts, charges or costs. She prayed that the tableau be amended as she claimed.

The First National Bank of Shreveport filed an opposition. The bank averred it was the owner of two promissory notes given by

S. J. Zeigler, on May 14, 1890, due respectively at one and two years from date, each for the sum of three thousand three hundred and thirty-three dollars and thirty-three and one-third cents, with eight per cent. per annum interest thereon from date, payable to the order of Mrs. E. B. Griffin and by her endorsed in blank, less a credit on the first maturing note of one thousand five hundred dollars paid May 27, 1891, and less three hundred and seventy-three dollars and thirty-three cents for interest, which was also credited of May 27, 1891. That said notes were given as part of the purchase price of certain property described in their opposition, being fractional block sixty-four of the city of Shreveport, with the buildings and improvements thereon, and secured as to payment of principal, interest and attorney's fees by special mortgage on said property. That it became the owner of the first maturing note by purchase from the owner thereof on February 14, 1892, for value and in due course of business, and all the rights, privileges and actions belonging thereto, and further avers that inadvertently and through error and by its cashier, opponent gave on April 17, 1892, to S. J. Zeigler a receipt or certificate that it held as collateral security for the payment of any and all indebtedness due and to become due to it by said Zeigler the said note, together with other notes; whereas, in truth and in fact the said note was the property of opponent by purchase as aforesaid. That it became the owner of the second maturing note by purchase from the owner thereof on May 17, 1892, for value and in due course of business, together with all the rights, privileges and actions thereto belonging, including the vendor's lien and special mortgage on said described property to pay and satisfy same, and has continued to hold same as owners, and any receipt, certificate or paper of any kind given by opponent to Zeigler, that it held said note as collateral for any debt or obligation of said Zeigler to opponent, was inadvertently and erroneously given.

That on June 24, 1894, it paid to the sheriff, ex-officio tax collector of Caddo parish and State—the State and parish taxes due by said Zeigler on said property for the years 1892 and 1893, together with interests, costs, etc., aggregating the sum of one hundred and seventy-three dollars and eighty-five cents, and said sheriff and tax collector thereupon subrogated opponent to all the rights, liens and mortgages existing on said property to said parish and State according to law, and in virtue of said payment and subrogation opponent

had a special lien, privilege and mortgage on said property in pref-
erence to all other claims for the reimbursement of said sum of one
hundred and seventy-three dollars and eighty-five cents, with two
per cent. per month thereon penalty for non-payment of taxes due
the said State and parish, as aforesaid, and due to opponent from
June 25, 1894, until paid.   That on August 16, 1893, opponent paid
to N. B. Murff, comptroller and tax collector of the city of Shreve-
port, the taxes due by said Zeigler to said city on said property for
the year 1892, amounting to one hundred and three dollars and
fifty cents, and thereupon in accordance with law the said comp-
troller and tax collector subrogated opponent to all the rights, liens
and privileges theretofore held by said city on said property for
payment of said taxes, and in virtue thereof it had a special
lien and privilege on said property for the reimbursement of said
sum with ten per cent. thereon per annum, from August 10, 1893,
until paid, and entitled to be paid by preference over other creditors,
out of the said property or its proceeds.   That as holder and owner
of said notes secured by special mortgage and vendor's privilege on
said property opponent had superior rights, liens and privileges over
all other creditors of Zeigler on said property, and entitles it to be
paid the amount of said notes, costs, and five per cent. attorney's
fee thereon by preference over other creditors out of proceeds of
sale of said property, save and except the taxes hereinbefore set
out.

That the syndics had sold the property for the sum of sixty-six
hundred dollars cash, which they still hold and refuse to pay to op-
ponent, and had placed opponent on their tableau as an ordinary
creditor.   Opponent prayed that its liens and privileges on said
property and its proceeds be recognized and enforced for the
amounts set forth, including costs, five per cent. for attorney's fees
on said notes, and that the syndics be ordered to pay same out of
the proceeds of said property.

The Merchants and Farmers Bank of Shreveport filed an oppo-
sition in which it averred that on the tableau of debts the syndic
had placed a special mortgage in favor of the minor heirs of Mrs.
Sallie Vance Zeigler, to the amount of seventeen thousand dollars on
a certain interest in a certain property in Caddo parish, surrendered
by said Zeigler, known as the "Haynes Place."   Opponent averred
that subsequent to said special mortgage, the said "Haynes planta-

tion " was sold at a judicial sale made for the purpose of effecting a partition in a suit for partition instituted by one of the owners in indivision of said property, viz.: Nancy J. Mitchell against the other owners in indivision, including said minors who were parties to said suit; that at said sale S. J. Zeigler purchased said property; that by said sale any mortgage existing in favor of said minors on said property was extinguished and attached to the proceeds of said sale. That opponent is owner of certain notes executed by said Zeigler, secured by mortgage on said property, executed by Zeigler subsequently to said sale. That said mortgage is the only mortgage on said property, and the said property is not encumbered with that of the minors. They opposed the tableau, and prayed that said minors' mortgage, in so far as it concerns said property, be rejected and disallowed; that opponent be recognized as sole mortgagee having rights in said property.

Mary Lee Zeigler and Vinnie Zeigler, children of S. J. Zeigler and Sally Vance, filed an opposition, in which they represented that after their mother's death their father was confirmed as the natural tutor of the four minor children, issue of the marriage of their father and mother, and qualified by recording an extract of inventory, as required by law. That after qualifying he obtained a discharge on all his property from the minors' mortgage, except such portions as he presented to the court and the family meeting for a special mortgage. That he presented a list of property, which opponents described, in which he claimed certain undivided interests therein as owner and gave a special mortgage thereon in lieu of the minors' general mortgage. That at the time said special mortgage was given for seventeen thousand dollars on the above claimed interests of their father in said property, an account filed by him as tutor showed an indebtedness to his minor children of eighteen thousand six hundred dollars on June 23, 1887, which indebtedness had since been increased, until now it stood at fifty-nine thousand eight hundred and fifty dollars, as shown by account rendered since the emancipation of opponents, and that the valuation placed on property specially mortgaged in commutation of the minors' general mortgage was twenty-five thousand four hundred and eighty-five dollars. That this special mortgage given as above, together with the judgment of the court homologating the *proces verbal* of the family meeting recommending said special mortgage

in lieu of the minors' general mortgage, was and is an absolute nullity, for the reason that said Zeigler did own but a small part of the property on which the said special mortgage was given, the said minors owning the remainder. That the only property thus specially mortgaged, which was owned by their father at the time, or was still now owned by him, was an undivided half interest in lots 9, 10, 11 and 12, in block 62, in city of Shreveport, valued at the time at seven thousand dollars, and an undivided three-tenths interest in the "Wm. Haynes lands;" that the "Haynes plantation" in its entirety was valued at the time at ten thousand eight hundred dollars, making the three-tenths of their father to be valued at three thousand two hundred and forty dollars, which, added to one-half of seven thousand dollars, the valuation of lots described, would give to their father on all the property included in said specal mortgage an interest valued at the time at six thousand seven hundred and forty dollars. That even in this small part of the property thus specially mortgaged, he only owned the *residuum* after paying the debts due by the community that had existed between him and opponent's mother. That at the death of their mother their father was indebted to her in a sum of over forty thousand dollars for separate funds of their mother used by him for the benefit of said community. They represented that they were the only heirs of that claim, which is entitled to be paid by preference out of all the property that belonged to said community, and that all of the property included in said special mortgage that did not belong to opponents was property that belonged to the community that had existed between opponents' father and mother, and that all of the property belonging to said community would not be sufficient to pay the aforesaid debt, due their mother at the time of her death, and consequently there was no residue for their father to own, sell or mortgage. They set forth that they were the owners of all the other property included in said special mortgage in this way. That their mother, in her last will and testament, gave to her husband (opponents' father) an undivided quarter interest in all her property, but that their father married again on July 14, 1887, a few days after said special mortgage was given, and that before said second marriage, their father held the property given him by his deceased wife by a defeasible title which, on his second marriage, reverted to his said minor children by his

first marriage, and that before said reversion he was forbidden by law to dispose of same in any manner. They averred that since their mother's death, two of the minor children left by her marriage with S. J. Zeigler had died, without issue, and that the share on all the reverted property, above described, became vested in opponents as the surviving children of their mother; that in the schedule of debts filed in the insolvency proceeding there was a failure to place thereon any indebtedness as due to opponents. They prayed that their claim for fifty-nine thousand eight hundred and fifty dollars, due them by their father, as tutor, be placed thereon, and for judgment restoring their general mortgage on all their tutor's property, as of date of filing of the inventory, and that their claim be placed on the schedule of debts as secured by general mortgage on all the property of their tutor, or its proceeds, the same as if there had been no attempted commutation of mortgage.

S. Levy, Jr., answered the opposition of the First National Bank. He claimed to be the owner of three promissory notes executed by Zeigler, secured by special mortgage on fractional block 64 in Shreveport, and that he was entitled to be paid by preference out of the proceeds of the same, which proceeds were insufficient to pay even his claim. He denied the allegations of the opposition of the First National Bank, and specially denied it had any preference over him. He averred that at the maturities of the notes claimed to be owned by the First National Bank they were paid by the maker, and by said payment they and the mortgage and privilege securing them were extinguished. That at the time of said payment opponent was the holder of the notes he now owns, and by said payment his notes took rank as a first mortgage on said property, and still occupied that rank; that subsequent to said payment Zeigler pledged the extinguished notes to the First National Bank to secure debts due by him to said bank, and attached them with other notes to her individual notes, evidencing the amount of her indebtedness. He denied that the First National Bank was then or ever was the owner of said notes, but averred that if it had any rights at all it was as holder of said extinguished notes as collateral; that for these reasons as well as those contained in an exception and plea of estoppel which he filed, he prayed that his rank as fixed by the tableau be sustained, and the opposition of the First National Bank be dismissed.

The exception and estoppel thus referred to were that in the con-
tracts between Zeigler and the First National Bank, under which it
became holder of the notes on which that bank bases its claim, the
bank acknowledged that it had received same from Zeigler, and held
the same as collateral security to secure payment of his indebted-
ness to the bank, and the bank, by such written contract and
acknowledgments, was estopped from denying same and claiming or
attempting to claim that it held said notes otherwise than as col-
lateral under said contract; that the bank can not question or attack
the said contracts collaterally, or in an opposition to a tableau of
debts filed by the syndics, but only by direct action to annul the
same.

The District Court rendered judgment decreeing that the tableau
of debts filed be corrected and amended, as follows: "It is ordered
that the opposition of Mrs. M. F. Smith be sustained as regards her
claims for attorney's fees; her claim for interest being rejected after
date of sale of mortgaged property, and the tableau be recast so as
to include the amount claimed by her for attorney's fees, and two
per cent. per month for taxes paid.

"It is ordered that the opposition of the First National Bank of
Shreveport, claiming to be placed on the tableau for two hundred
and seventy-seven dollars and thirty-five cents, with two per cent.
interest per month thereon for taxes paid the State and parishes of
Caddo and Bossier, and ten per cent. per annum on the amount paid
the city of Shreveport be sustained. It is further ordered that other
opposition filed by this bank be and the same is hereby rejected.

"It is further ordered that the opposition of George E. Gilmer,
under-tutor for the children of Sallie Vance Zeigler (Mary Lee and
Vinnie Zeigler), claiming ownership of certain properties lying in
Bossier and Caddo parishes, advertised for sale by the syndics
herein, be sustained, and Mary Lee and Vinnie Zeigler are hereby
recognized as owners of all the property claimed by them in their
oppositions herein filed, and the syndics are enjoined from making
any sale thereof.

"It is further ordered, adjudged and decreed that the general
mortgage resulting from the inscription of extract of inventory in
the records of Bossier and Caddo parishes in the tutorship of the
minors Zeigler, the beneficiaries herein (now being Mary Lee and
Vinnie Zeigler), No. ——— on the docket of this court, showing the

minors' rights to be in amount fifty-nine thousand eight hundred and fifty dollars and seventy-six cents, is hereby recognized as outranking all mortgages predicated by S. J. Zeigler on any of the property owned or held by him since said recordation of said extract, and the syndic's account is amended so as to place thereon the sum of fifty-nine thousand eight hundred and fifty dollars and seventy-six cents in favor of Mary Lee and Vinnie Zeigler, to be paid by preference out of proceeds of all the property heretofore sold by said syndics over any and all creditors on the tableau filed, except the expense of selling the property, taxes and law charges.

"It is further ordered, and decreed that the said Mary Lee and Vinnie Zeigler are recognized as creditors of the community heretofore existing between S. J. Zeigler and his former wife, Sallie Vance Zeigler, to the amount of thirty-two thousand and forty dollars, and they are hereby placed on the tableau as creditors to that amount to be paid in preference to all other creditors on the tableau (except for taxes, law charges and expenses of administration herein) out of the proceeds of the community property already sold herein by the said syndic, or that has been surrendered by said Zeigler."

Mrs. M. F. Smith appealed from the judgment in so far as it rejected her claims and right to interest on her mortgage debt after the sale of the mortgaged property, and also in subordinating her special mortgage to the general mortgage of the minors and reinstating said mortgage of said minors to her prejudice.

S. Levy, Jr., and L. M. Carter, syndics, appealed from the judgment rendered against them on the oppositions of Mary Lee and Vinnie Zeigler and Mrs. M. F. Smith. The First National Bank of Shreveport appealed from the judgment, rejecting its opposition, reinstating the minors' special (general) mortgage in favor of Mary Lee and Vinnie Zeigler. S. Levy, Jr., in his own right, appealed from the judgment so far as it is in favor of Mary Lee and Vinnie Zeigler. The Merchants and Farmers Bank of Shreveport appealed from the judment in favor of Mary Lee and Vinnie Zeigler. S. G. Dreyfous & Co. joined the syndics in their appeal and appealed from the judgment, in so far as the judgment subordinated the judicial mortgage in favor of the St. Louis & Southwestern Railway Company, to which they had been subrogated to the general mortgage of the minors, and to that portion of the judgment reinstating the said general mortgage to their prejudice.

## On the Opposition of Mrs. M. F. Smith.

The opinion of the court was delivered by

NICHOLLS, C. J.   The judgment of the District Court, allowing Mrs. M. F. Smith attorney's fees, is correct.   Her claim was not paid as it should have been, and the result of its non-payment was to bring about a condition of affairs which made the employment of counsel necessary for the protection of the creditors' rights.   (See Mullen vs. His Creditors, 39 An. 397.   Succession of Duhe, 41 An. 209.

The court erred in arresting interest in favor of Mrs. Smith from the date of the sale of the property on which her mortgage rested. Caldwell vs. His Creditors, 9 La. 265; Brownson vs. Baker's Creditors, 1 La. 409; Smalley vs. His Creditors, 3 An. 386; Blouin vs. Liquidators of Hart & Hebert, 30 An. 716.

In Brownson vs. Baker the court held that the promise to pay interest on a note entered into the obligation of a contract and constituted as much a part of the debt as any portion of the principal sum and continued to run until payment; that payment into the hands of an administrator of the proceeds of the property of a succession would not stop interest until the money is paid over to the creditor.

In Collier vs. Creditors, 12 Rob. 398, the court held, as we understand, that Collier was under no contractual obligation to pay interest on the Byrnes notes; that Byrnes himself was not bound to pay interest on them, as they had not been protested as was then necessary; that the liability of Collier to pay interest rested, if liability existed at all, on the fact that he had become the possessor of fruit-producing property.   The court evidently held that the moment the property passed out of Collier and the insolvent estate into the hands of others, the fact on which the liability to pay interest rested, no longer existing interest should cease to run against the insolvent. We understand interest to have been claimed in that case generally—that is to say, *dehors* the fund produced by the sale of the property.   We think the condition of affairs here is entirely different, and that Mrs. Smith was entitled to interest until she is paid.

## On the Opposition of the First National Bank of Shreveport.

The First National Bank of Shreveport, claiming to be the holder and owner of two notes, secured originally by mortgage on

the Alston Warehouse property, in the city of Shreveport, asked to be recognized as such and to be held entitled to have a decree in its favor; that payment of such notes was still secured by special mortgage.     Its claim to that effect having been rejected, it appealed.     It is claimed by the syndics and Levy, a creditor holding a second mortgage on that property, that the notes were paid by the bank, and the mortgage securing the same fell with the payment; that the bank recognized the fact of such payment by consenting, afterward, to hold the same notes as collateral for subsequent new notes, made by Zeigler, representing an indebtedness due by Zeigler to the bank, at the time of the execution of the new notes; the new notes being payable a considerable time in the future, and including interest, and that included in these notes was the indebtedness which the mortgage notes represented and secured, and that the First National Bank is estopped from claiming to hold notes otherwise than as collateral.     That the original claim was not valid. The notes in question were forwarded, at different times, in the early part of 1892 to the First National Bank of Shreveport for collection, by Hollins & Co., of New York, who were the holders of the same.     Zeigler, the maker, was not able to pay them.     The bank advanced the money, remitting the same to Hollins & Co.  The bank placed the notes, when paid by it, in the cash drawer as so much cash, not charging Zeigler with it.

On the 9th of April, 1892, the amount of the note first sent forward by Hollins & Co. was, together with the amount of an open account then due by Zeigler to the bank (together with interest), embodied in the three notes we have spoken of, amounting to fourteen thousand eight hundred and ninety-six dollars, and delivered to the bank.     Simultaneously with the making of these notes the bank executed and delivered to Zeigler a certificate, certifying that they held as security for the payment of all indebtedness then due, or might become due by him, the notes described in said certificate, among which figured the first note in question, which is thus referred to: "S. J. Zeigler's mortgage note dated May 14, 1890, payable twelve months after date from Mrs. E. E. Griffin for three thousand three hundred and thirty-three dollars and thirty-three and one-third cents, with credit endorsed on same May 27, 1891, for one thousand five hundred dollars, leaving the balance of the note extended to January 26, 1892, for one thousand eight hundred and

thirty-three dollars and thirty-three cents, with eight per cent. interest from that date."

The second note was dealt with separately, but in the same way; that is to say, Zeigler executed a new note for the amount of the second note, payable ahead, with interest included, but the bank retained possession and control of the second note as it had retained possession (as we omitted to say) of the first note when the three notes were executed on the 7th of April, 1892. Both notes are still in the possession of the bank. It has never surrendered them or lost control over them. We think the evidence establishes that when these notes reached Shreveport for collection Zeigler told the bank that he was unable to pay, and that when the bank did remit the amounts to Hollins & Co., it was the understanding between the bank and Zeigler that in doing so "they were to have the same rights as Mrs. Griffin had, and to hold the notes against him "—that "the bank was to take up the notes and hold them with the same rights that the other parties had." We do not understand that the bank ever intended to act in such manner as to either absolutely extinguish the note or the mortgage, or that Zeigler expected or intended it to do so. The object of the parties was, that whilst operating a payment of the notes, so far as Hollins & Co. were concerned, the remittance to them should operate as a transfer of the notes to the bank. It is not claimed that there was, as between the bank and Hollins & Co., any agreement to sell the notes to the former.

A consideration of the facts connected with those remittances to Hollins & Co. has brought us to the conclusion that as between the bank and Zeigler the bank was entitled to hold the position of a purchaser of the notes.

The notes had been forwarded to the bank for collection, and it was its duty to collect. If it thought proper, instead of collecting, to make concessions to the maker, it would become bound to Hollins & Co. for so doing. The very fact of consenting to grant time to the maker, which was what was substantially consented to by the bank imposed upon the latter the obligation of paying Hollins & Co. This it did, and when it did so we are of the opinion it was entitled to hold the notes with its accessory rights (Pritchard vs. Bank, 2 La. 416), as owners with subrogation (see Marcadé, under Art. 1236, C. N.).

We find it announced in Randolph on Commercial Paper, Sec. 1439, that "a payment by a mere volunteer paying a note is not a purchase; that the purchaser has no right to be subrogated to the rights of the holder, the circumstances under which he made the payment being a question of fact for the jury to determine; but that if a note is paid by one who is not a party to it, it will be presumed to have been done with the consent of the principal debtor, who should have made payment * * * The intention of a stranger to become a purchaser may be shown by him, and in such a transaction the intention of the parties govern, and although the stranger takes up the note for the maker, and, at his request, both the note and collateral mortgage may be kept alive in his hands. Ramsey vs. Daniels, 1 Mackey, 16 (1880); Boyce vs. Shiver, 3 S. C. 515 (1871).

"Where one advances money, at the maker's request, to pay a note, under an agreement that he shall hold it, he may bring an action on it as a purchaser against the makers and endorsers. Randolph, Sec. 1440; Horton vs. Manning, 37 Texas, 23 (1872). In a foot-note to that section we find it stated that where the bank at which a note was payable paid it and charged it to the maker, whose account was insufficient, it is a purchase, and it may bring its action against the maker." Watervliet Bank vs. White, 1 Denio, 608 (1845).

Under Sec. 1438 of the same author we find it stated that "if a note in the hands of the administrator of the last holder is duly accounted for him as so much cash, it will amount to a transfer of the note to him individually by operation of law." Smith vs. Gregory, 75 Mo. 121 (1881).

Obviously it was the duty of the administrator to collect, but if instead of collecting he charged himself with it in his dealings with the succession, and paid over the amount to those entitled to receive it, he was entitled to receive the note as if by a transfer. The maker could not claim as an extinguishment an act which was not intended for his benefit by the party who did the act. It was a matter of no moment to him, we assume, in that case, whether the succession or the administrator was the holder. If the party taking up a note does so for the qualified benefit of the maker, at his request, and under conditions, the latter can not free the act when done from the conditions under which it was done.

There is still another view to be taken of this matter. The bank

was a creditor of Zeigler—a chirographic creditor, it is true, but none the less a creditor. The notes in question were mortgage notes, and the bank had an interest in taking them up. When it did so it acquired ownership of the same by legal subrogation as if by transfer. There is no inconsistency in plaintiffs' claiming to hold the notes as owners, and to hold them through payment by subrogation. Marcadé, under Art. 1336, C. N., sustains this view of subrogation.

Article 2161 of our Civil Code declares that subrogation takes place of right for the benefit of him who, being a creditor, pays another creditor whose claim is preferable to his, by reason of his privileges and mortgages.

Article 1251 is the corresponding article of the Code Napoleon.

In Dalloz "Les Codes Annotés," we find SUBROGATION thus referred to:

"L'Article 1251, 1, ne faisant aucune distinction entre les différentes classes de créanciers il en résulte que la subrogation légale n'est pas restreinte aux créanciers hypothécaires; elle a donc lieu de plein droit au profit du créancier chirographaire qui a payé un créancier hypothécaire qui lui est préférable." Douai, 20 November, 1839, J. G. Obligations 1094; Observ. Conf. *ibid.*; Quest. Contrav.

Laurent "Droit Civil Français," Vol. 18, on "Obligations" Sec. 69 says: "Le créancier chirographaire peut il profiter du bénéfice de l'article 1251, No. 1. Si l'on s'en tient au Code la question n'est pas douteuse. Le texte est conçu dans les termes les plus généraux; il parle des créanciers sans limiter le droit de subrogation à une certaine catégorie de créanciers. On objecte que l'article 1250 en disant que le créancier payé doit être préférable a raison de ces privileges ou hypothèques à celui qui paye suppose que celui-ci est un créancier hypothécaire primé par un créancier antérieur et à l'appui de cette interprétation on invoke l'ancien droit. Cette interprétation restreint la loi; le texte s'applique au créancier hypothécaire, aussi bien qu'un créancier hypothécaire, car l'hypothèque est essentiellement un droit de préférence; et a l'égard de qui ce droit s'exerce-t-il? Regulièrement à l'égard des créanciers chirographaires; ceux-ci sont donc très interressés à prévenir l'expropriation de leur débiteur, c'est-à-dire la perte de son crédit et la ruine en disintéressant des créanciers hypothécaires qui n'ayant rien à risquer seraient tentés d'user de toute la rigeur de leur droit * * * C'est l'opinion générale des auteurs, sauf le

dissentiment de Grenier et la jurisprudence est d'accord avec la doctrine.''

This court so held in Weil vs. Ginnery Company, 42 An. 496. We do not think the notes were novated. Novation is not presumed. The intention to novate must be clear. The notes were not surrendered. It is a matter of every-day occurrence for the maker of a note to give the holder thereof a new note, payable in the future, with interest included, leaving the old note in the hands of the holder without the slightest idea that the latter should be substituted or replaced by the former and extinguished by it. The taking of a new note in renewal of one secured by mortgage operates no novation, it has been held, where the first was not surrendered by the creditor. Exchange and Banking Company vs. Walden, 15 La. 434; Short vs. City, 4 An. 281; Lalande vs. Breaux, 5 An. 508. The very fact that the note was delared to be a collateral by the cashier who made out the certificate we have referred to, shows that it was not considered or intended to be considered as an extinguished obligation. It would have been folly to have given up an existing secured obligation, and after extinguishing it, attempt to make use of it as a collateral. The bank pleads that any statement made by its cashier which would tend to show that the notes had been extinguished or novated, was made in error. We think the intention of the parties controls the situation. It is obvious to us there was no intention either to extinguish or novate the notes. We think there is no estoppel in this matter. If error was committed in the use of the word '' collateral '' no one was injured by it, and no one shifted or altered positions in consequence of it· We think the bank was authorized to offer testimony in support of the circumstances under which it paid the notes and the circumstances under which the new notes and certificate were given. The bank and Zeigler, the only parties to the transaction, were at liberty to rectify any error which may have occurred in the wording of the certificate, and we do not think that right was cut off in favor of the bank by Zeigler having gone into insolvency. We think the District Court erred in its action upon the opposition of the First National Bank in rejecting its claim to have the notes which it presented recognized as being still alive and as secured by mortgage, and to have the same enforced in its favor.

ON THE OPPOSITION OF MARY LEE AND VINNIE ZEIGLER, CLAIMING OWNERSHIP OF PROPERTY.

Upon this branch of the case, we find in the transcript an agreed statement of facts, as follows:

S. J. Zeigler and Sallie E. Vance were married on the 13th of February, 1877.

They had children of their marriage, viz.: Susie, Saidee, Mary Lee and Vinnie Zeigler. Mrs. Sallie Zeigler died on the 8th day of April, 1885, leaving a large estate, and a will devising to her husband an undivided one-fourth interest in her estate, the balance being left to her other children, viz.:

Mary Lee, Vinnie, Saidee and Susie.

After the death of Mrs. Zeigler two of these children died, Susie on the 8th of January, 1887, and Sadie on June 3, 1891, respectively.

Zeigler contracted a second marriage July 14, 1887.

The "Plain Dealing" plantation, in Bossier parish, was inherited by Mrs. Zeigler, and was her separate property. After her death S. J. Zeigler, claiming under her will and as heir of her deceased child an undivided nineteen-sixty-fourths interest in "Plain Dealing," sold to W. O. Perrin, on the —— day of ———, A. D. 1887, an undivided nineteen-one-hundred-and-twenty-eighths interest in said property, by act of sale recorded in Bossier parish, on the —— day of ———, 1887. Subsequently Perrin instituted suit against Zeigler and against the minor heirs of Sallie E. Zeigler for a partition of "Plain Dealing." These minors were properly represented by special tutors appointed by the court, and issue was duly joined and answer filed by their tutor and under-tutor. Thereupon a decree was rendered in said suit by the District Court for Bossier parish, directing a partition by licitation. A writ of sale was issued, and after complying with all formalities and requirements of law, the property was sold at sheriff's sale, on the 24th of July, 1888, to S. J. Zeigler, for the price of three thousand dollars cash (received by the sheriff). This sale was duly recorded in the parish of Bossier, on the 24th of July, 1888.

A portion of the plantation was laid off in blocks and lots, constituting the present town of Plain Dealing.

Subsequently Zeigler sold portions of this property to John McAneny, J. E. Johnson and others, and mortgaged portions of it to others, as appears by deeds duly recorded in Bossier parish. Notes

given to Zeigler for purchase of portions of "Plain Dealing," and notes given by him secured by mortgage on other portions of same are now held by S. Levy, Jr., and by the Merchants and Farmers Bank of Shreveport.

### HAYNES PLACE, CADDO.

William Haynes, deceased, left a plantation in Caddo parish, known as the "Haynes plantation." By last will he left to Mrs. Sallie E. Vance undivided one-eighth interest in said plantation, and the remaining seven-eighths to quite a number of relatives.

During the lifetime of Mrs. Sallie E. Vance, S. J. Zeigler purchased the interest of James Haynes, Missouri C. Haynes, H. C. Haynes and John Haynes, and after her death purchased the interest of M. E. Bennett. In the year 1892, one of the heirs (viz.: Nancy J. Mitchell) instituted suit for the partition of the "Haynes place." The minor heirs of Mrs. Sallie Zeigler were made parties to this suit and were represented by special tutors. A judgment was rendered decreeing a partition by licitation. A writ of sale issued under which, after the compliance with all requirements of law, the place was sold to S. J. Zeigler for the price of four thousand eight hundred and thirty-two dollars, and deed was duly recorded in Caddo parish on the 7th day of March, 1892.

Subsequently, on April 27, 1892, Zeigler mortgaged this plantation to secure payment of a note for eight thousand dollars, now held by the Merchants and Farmers Bank of Shreveport.

On the 6th of July, 1887, Zeigler gave a special mortgage in favor of his children on the undivided 19-64 of 1-8 interest in "Haynes place" and on an undivided 83-128 of an undivided 1-8 interest therein and other lands described in opponent's petition.

### RESIDENCE, SHREVEPORT.

Lots 9, 10, 11, 12, block 62, Shreveport, were purchased by S. J. Zeigler during marriage of his first wife, Mrs. Sallie E. Zeigler, and as community property.

The entire interest of Zeigler in said property is specially mortgaged to his minor children to secure his indebtedness to them as their tutor.

### BUCK HALL.

On October 18, 1884, by sheriff's deed, before death of his first wife, S. J. Zeigler purchased the "Buck Hall plantation," lying partly in Bossier and partly in Caddo parishes.

In 1884, and before the death of his first wife, Zeigler sold to S. E., M. B. C. and S. W. Vance an undivided 1-8 interest in "Buck Hall," in Bossier, and to S. W. Vance an undivided 1-8 interest in "Buck Hall," in Caddo parish.

On June 15, 1888, by a conventional partition, the Vances took the north half of "Buck Hall," Bossier, and S. J. Zeigler the south half.

In June, 1891, Zeigler sold to S. W. Vance the south half of "Buck Hall," Bossier, and his interest in "Buck Hall," Caddo, also the interest of the minor heirs of Mrs. Sallie E. Zeigler in said property, stated to be 21-128 interest (the sale of the minors' interest having been recommended by a family meeting and authorized by a decree of the District Court for Caddo parish, the court of the minors' domicile). On same day, June 19, 1891, Vance mortgaged " South Buck Hall," Bossier, and one hundred and nine acres of " South Buck Hall," Caddo, to N. F. Thompson, to secure mortgage notes aggregating five thousand eight hundred ninety-eight and 30-100 dollars.

Subsequently Vance gave a second mortgage on same property to secure note for $———, acquired by S. Levy, Jr., who foreclosed mortgage, bought the property at sheriff's sale subject to the Thompson mortgage, and then sold it to Zeigler for $———, for which Zeigler gave note secured by mortgage and vendor's lien on said property, which note is now held by Levy.

The lot in town of Benton containing three acres was acquired by Zeigler during the existence of the marriage with his first wife, and he, in similar manner, during the marriage, acquired the following other property:

Lot in town of Benton containing one acre.

The undivided one-half interest in six hundred and eighty acres, known as the " Lewis lands."

The undivided one-half interest in five hundred and sixty acres known as the " Dutch John Hill Lands."

The undivided one-half interest of one-third interest in section 28, township 20, range 13 east, in Bossier parish.

S. J. Zeigler married Sallie E. Vance on the 13th of February, 1877. She died on the 8th of April, 1885, leaving four minor children issue of her marriage with Zeigler, to-wit: Mary Lee Zeigler, Vinnie Zeigler, Susie Zeigler and Sadie Zeigler. Susie died on the 8th of January, 1887, and Sadie on June 3, 1891, leaving no issue.

By the will of Mrs. Zeigler she bequeathed to her husband one undivided fourth of all her property. Zeigler contracted a second marriage."

Article 1753 of the Civil Code declares that "if a person who marries again has children of his or her preceding marriage, he or she can not dispose of the property given or bequeathed to him or her by the deceased spouse or which came to him or her from a brother or sister of any of the children which remain. This property by the second marriage becomes the property of the children of the preceding marriage and the spouse who marries again only has the usufruct of it."

This article has been specially discussed in Cook vs. Doremus, 10 An. 679, and Succession of Hale, 26 An. 201. In the former case this court held that " a surviving spouse who inherited one-fourth of the estate of a predeceased child of the first marriage forfeits the right of property in each estate by a second marriage and becomes only entitled to a usufruct thereof."

Under this decision and the article of the Code cited, we must hold that when Zeigler remarried, the interest which he held in the property which fell to him under his wife's will and that which he inherited from his two children Susie and Sadie Zeigler vested in Mary Lee Zeigler and Vinnie Zeigler, they being the heirs of their mother and sisters. The separate property of the wife became in its entirety the property of those two children and they became vested of the one undivided half of the community· under and through their mother and sisters.

The law having declared that the property so bequeathed and so inherited by Zeigler could not be disposed of by him in any manner, we are of the opinion that the property when it reverted by the second marriage, did so free from all mortgages or encumbrances created by Zeigler, and of any transfers made by him, unless there should be shown some special fact or circumstance which, under the law, would do away with this general result of what is usually known and designated as "the right of return." C. C. 1342, 1503, 1521, 1522, 1555, 1558.

This result comes from the principle which is announced in Art. 3268, that "such as only have a right that is suspended by a condition and may be extinguished in certain cases can only agree to a mortgage subject to the same conditions and liable to the same extinction." C. C. 548, 484, 732, 779.

It is claimed that Zeigler, on the          day of          , 1887, claiming under the will of his wife, and as heir of her deceased child, an undivided nineteen-sixty-fourths interest in " Plain Dealing," sold to W. C. Perrin an undivided nineteen-one-hundred-and-twenty-eighths interest therein.   That Perrin instituted suit against Zeigler and against the minor heirs for a partition of the plantation; that these minors were properly represented by special tutors; that issue was duly joined by their tutor and under-tutor, and a decree of court rendered ordering a sale of the property to effect a partition by licitation; that Zeigler bought at this sale, and that the effect of this sale was to cut off the rights of the minors and give him a new title.   We are not of that opinion.   When he sold the property to Perrin, he attempted to sell that which did not belong to him; the sale was an absolute nullity.   C. C. 2452.   Neither Zeigler nor Perrin (holding under Zeigler) could, by resorting to an action of partition, strengthen titles which had no existence.   The effect of the sale to Zeigler was simply to place him back into the position he occupied before the sale to Perrin.

The " Plain Dealing plantation " belongs in its entirety to May Lee and Vinnie Zeigler.

The two lots in Benton were acquired during the marriage between Zeigler and his first wife.   In reference to this property the District Court says: " Zeigler's interest was one-half.   This much he owned *pleno jurie*, but anything further claimed under his wife's will was held by a defeasible title.   The answer of the syndics' claims only nine-sixteenths or seventy-two-one-hundred-and-twenty-eighths interest, whereas they were proceeding to sell eighty-three-one-hundred-and-twenty-eighths."

We are of the opinion that the minors, May Lee and Vinnie Zeigler, are owners of an undivided half interest in that property as community property.

In regard to the " Lewis lands " and the " Dutch John Hill lands " the District Court says that " Zeigler during his first wife's life bought an undivided half interest in them.   The dissolution of the community vested in him one-half of an undivided half or one-quarter interest in full right.   The syndics in their advertisement claimed that Zeigler owned eighty-two-one-hundred-and-twenty-eighths interest, while in their answer they claim for him only nine-sixteenth or seventy-two-one-hundred-and-twenty-eighths.   He

really owned one-half of one-half, or one-quarter interest in the whole tract as community property.'' In that conclusion we concur. May Lee and Vinnie Zeigler own one undivided one-quarter interest in that property as community property.

The claim in respect to residence property in Shreveport, known as lots 9, 10, 11 and 12, in block 82, is thus disposed of by the District Court: '' This property was acquired during the community between Zeigler and his deceased wife, and at the dissolution of the community, Zeigler became seized of one-half undivided half interest therein, subject to the payment of community debts. But the syndics claimed and advertised for sale eighty-three-one-hundred-and-twenty-eighths, the excess being claimed under the will of Mrs. Zeigler, further increased by his inheritance from his two deceased children. If our view of Art. 1753 of the Civil Code be correct, Zeigler only has his community half—the other interest claimed for him having been defeated by his second marriage, and this community interest he owns subject to the payment of community debts.'' The court's view of Art. 1753 being correct, his conclusion that Zeigler only owned an undivided half interest in this property as community property is correct.

The minors, May Lee and Vinnie Zeigler, own an undivided half interest in the property as community property.

The opposition as to the Buck Hall property was dismissed and does not seem to be involved in the litigation before us.

The opposition in respect to the Haynes lands was thus disposed of below: '' The contest as to the Haynes lands stands upon a different footing, for unlike Plain Dealing property, there did exist in these Haynes lands a real diverse ownership affording a true basis for the partition suit and its consequent sale. The suit was brought by one of the Haynes heirs, who did own a certain part, for a partition, and the minors were represented by special tutors. It is said that they should have been represented by their under-tutor, but if this be true then the irregularity is one of that kind which is cured by the judgment rendered ordering a sale of the whole property. This sale is defective, nevertheless, in including Zeigler's fourth interest under his wife's will, which, as we have seen, had lapsed by his second marriage.''

The District Court, having gone thus far in its opinion, makes no distinct or direct announcement as to the rights of parties in the

Haynes property, but proceeds to say: " This brings us to a differ-ent branch of the opposition." It then proceeds to discuss the opposition filed by Mary Lee and Vinnie Zeigler themselves after their emancipation.

Taking up ourselves the question of the " Haynes Lands " contro-versy, we are of the opinion that under and through the partition sale made in that matter, Zeigler acquired a valid title to the whole property. There is no claim that the proceedings themselves were irregular—that the proper parties were not before the court; but it is contended that because Zeigler and the minors went into that pro-ceeding under an erroneous assumption as to the extent of their relative interests in the property, the validity of the sale was, to a certain extent, at least, affected; that to a certain extent the sale left the minors' rights therein untouched. We do not think so. The proceedings in partition are not before us, but we understand that the suit was brought by one of the heirs of Haynes who unques-tionably had an interest in the property for a partition of the same against S. J. Zeigler and the minors Mary Lee and Vinnie Zeigler—all of whom were, in fact, joint owners. That at the sale under a judgment of court in that matter ordering a sale of the prop-erty S. J. Zeigler bought. If all the parties in interest were before the court properly represented and the proceedings were reg-ular, we are of the opinion that an error in the extent of the inter-ests of the various joint owners in the property would not affect the validity of a sale made in the proceeding which would be otherwise legal. The only effect of this error would be that in the partition subsequently made, Zeigler would have to be ultimately made responsible to the minors for their actual interest in the property. He would hold the property under the sale, under a legal liability to settle with his children according to their real rights. We think the Haynes plantation belongs in its entirety to S. J. Zeigler.

The District Court, in its reasons for judgment, thus disposes of the opposition filed by Mary Lee and Vinnie Zeigler themselves after their emancipation.

" It is in evidence that at the time of Mrs. Zeigler's death her husband was indebted to her in the sum of thirty-two thousand and forty dollars for separate funds of the wife used for himself, or the benefit of the community. When Mrs. Zeigler died this claim against the community passed by inheritance to her children. Two of these

children have since died, and their parts have gone to the children, who are opponents herein. The interest in the assets of a dissolved community is simply an interest in the *residuum*—that is what remains after paying community debts (Newman vs. Cooper, 46 An. 1485). The only debt due by the community is to these children, amounting to thirty-two thousand and forty dollars, and Zeigler had no interest in the assets of the dissolved community which he could sell to the detriment of this claim, which Mrs. Zeigler while living had a right to enforce by action. The interest of the minors as shown by the inventory taken in 1885, immediately after the death of their mother, was valued at eleven thousand three hundred and fifty dollars. If one-half interest was conceded to them the valuation of all the community property was twenty-four thousand seven hundred and fifty dollars. If, however, Zeigler, in addition to his half, claims one-fourth of his children's half it would give him five-eighths and his children three-eighths. This would make the valuation of the whole of the community assets thirty-one thousand two hundred and sixty-six dollars—still not enough to pay that community debt. Hence there could result no *residuum*.

"There remains one more contention of these minors, and that is their rights against their father as tutor which have been established at sixty-seven thousand seven hundred and seventy dollars and fifteen cents, while their interest in property in Bossier parish and Caddo parish was inventoried at ninety-eight thousand four hundred and forty-three dollars. Considering that this inventory was taken on the basis that Zeigler was owner of one-fourth of his wife's property by virtue of her will, the minor's property was increased to that extent by the reversion of this one-fourth when Zeigler married. A little while before his remarriage, Zeigler provoked a family meeting, and, with its approval, secured a judgment of this court restricting the minors' mortgage to certain specified property and canceling it as to all other of the tutor's property. The property presented and accepted for this so-called special mortgage was appraised by experts appointed by the court at twenty-five thousand dollars. A mortgage for seventeen thousand dollars was recommended and taken, and declared to be twenty-five per cent. over and above the tutor's indebtedness to the minors as shown by the account homologated in June, 1887. But a scrutiny of this account will fail to show how this amount was arrived at. The

account shows a declared balance of only three thousand five hundred and ninety-seven dollars and ninety-one cents, and this the *proces verbal* of the family meeting, as well as the act of mortgage, declares was not the amount. It results, therefore, there was no previous liquidation made, according to law, ascertaining the amount due the minors. The commutation of the minors' general mortgage is for the convenience of the mortgagor. It is allowed to him in order that his property may not be unnecessarily burdened. All that the law requires is that the interests of the minors should be protected, but protection is required, and nothing less will satisfy it. Guillet vs. Jure, 15 An. 417; 23 An. 554; Isaacson vs. Mentz, 33 An. 595.''

How was the protection secured in that case? By assessing the property specially mortgaged, which was wrongfully supposed to belong to the tutor, at twenty-five thousand dollars, and in an agreed special mortgage of seventeen thousand dollars, declaring this mortgage to be twenty-five per cent. in excess of the amount as ascertained to be due to the minors, substituted in place of the general mortgage. That ascertainment of the amount due, according to Art. 331 of the Code, should have included "all interests which will probably accrue.'' That account now stands, including all interests which have accrued, at the sum of sixty-seven thousand seven hundred and seventy dollars and fifteen cents, and thus shows how inadequately have the interests of these minors been guarded by this special mortgage, even if Zeigler owned the interest in the premises thus mortgaged, as claimed by and for him.

The other property retained under the mortgage retained by the family meeting is 83-128 interest in lots 9, 10, 11 and 12 in block 62 in the city of Shreveport, admitted to be community property, and 83-128 interest in an undivided half interest in the " Haynes lands.''

Zeigler's 83-128 interest in the lots in block 62 was made up in this way: his community interest and one-fourth of one-half under his wife, augmented by his alleged inheritance from his deceased minor children. The same is true of his interest in the " Haynes lands,'' which interest was his half or community interest in such portions as he purchased during the community and such portions as he purchased after the death of his wife.

Under Art. 1753 of the Civil Code, this undivided one-fourth interest, thus held under the will of his wife, was a defeasible interest which passed to his surviving children when he remarried, and which

he could not dispose of. But by far the larger part of the property included in the special mortgage was the sole property of the minors. He could give no legal mortgage on the property of another. In the Succession of Anna B. Nusbaum, 34 An. 902, the court held that the special mortgage, to be given by the natural tutor in lieu of the general mortgage of the minors, on all his property, must be executed by the tutor on his own property, and could not be given by a third person for him. If such transactions are to be sustained by the courts, it can well be said, in the language of Chief Justice Bermudez, in 33 An. 49-56, Life Association of America vs. G. L. Hall, "if the general mortgage. which the law has created for the protection of the rights of minors, over which it watches with jealous eye and great solicitude, could be effectually destroyed, as is attempted to be done in this case, the shield with which it is said it covers them would be nothing but a thin vapor, a real mockery."

The judgment of the court in respect to this opposition, as we have seen, recognized Mary Lee and Vinnie Zeigler as creditors of the community between S. J. Zeigler and wife to the amount of thirty-two thousand and forty dollars, and ordered that they be placed on the tableau as creditors to that amount, to be paid by preference over all other creditors on the tableau (except for taxes, law charges and expenses of administration) out of the proceeds of the community property already sold by the syndics or that had been surrendered by Zeigler. It further recognized the general mortgage arising from the inscription of the inventory in the records of Bossier and Caddo parishes in the matter of the tutorship of the minor Zeigler, being (now) Mary Lee and Vinnie Zeigler, showing the minors' rights to be in amount fifty-nine thousand eight hundred and fifty and seventy-six-one hundredths dollars as outranking all mortgages predicated by S. J. Zeigler on any of the property owned or held by him since the recording of said extract, and that the syndic's account be amended so as to place the sum of fifty-nine thousand eight hundred and fifty and seventy-six-one hundredths dollars in favor of Mary Lee and Vinnie Zeigler, to be paid by preference out of the proceeds of all the property heretofore sold by the syndic over and above all creditors on the tableau filed, except the expense of selling the property, taxes and law charges.

If we assume as correct the statement that at the time of the death of Mrs. Sallie Vance Zeigler the community was in-

debted to her in the sum of thirty-two thousand and forty dollars, and that that sum has not been paid, the consequence declared by the court would follow, that the husband's rights in the community property being subordinated to the payment of the community debts no creditor of his could acquire rights upon that property except being also subordinated to the payment of such debts. In Ealer vs. Lodge, 36 An. 117, this court said that " no act of the widow in her own name or as tutrix and no act of the heirs whether of age or not could deprive the creditor of the community of his right to be paid out of the common property in preference to any right of ownership which the widow or the heirs acquired thereto at the dissolution of the community." It has been repeatedly held that community creditors are entitled to a priority on community property over the separate creditors of the spouses. This preference is secured neither by a privilege nor by a mortgage technically, but is the result of the tenure or character of the interest of the spouses in the property. It is analogous to the right of preference of partnership creditors over the creditors of the individual partners. Let us suppose the case of a wife dying to whom the community is indebted thirty thousand dollars or forty thousand dollars—that the husband should have qualified as tutor of his minor children, and after placing of record an inventory which carried with it, by its registry, a general mortgage in favor of his minor children as security of their rights should have caused the general mortgage to be restricted to specific property and a special mortgage to have been additionally given on the same property, but the balance of the property freed from mortgage of any kind. Would the question of mortgage *vel non* on the father's property control the question of the extent of the rights of his minor children in the community property or determine what their right of payment out of that property would be as compared with the right of the creditors of their father to be paid out of that property? Undoubtedly not—their right is not only based upon the fact of being creditors, but upon the fact that their father's rights (and therefore the right of any one holding under him) are conditioned upon an adjustment or settlement of the community, and in this settlement the wife holding a claim against the community would stand *quoad* any separate creditor of the husband as any other creditor of the community—so long as the community is

not liquidated or settled the children have a claim upon community property for the debts due them by the community, a protection really higher and greater than through either mortgage or privilege. Registry is not necessary for this protection —it springs, as we have said, from the tenure itself under which the property is held. In the case of LeBleu *et al.* vs. North American Land and Timber Company *et al.*, 46 An. 1465, we were called on to explain the difference between a minor's right as resulting from ownership and that resulting from the liability of the tutor on his property through the tutorship. Property rights in that case were shown to be totally independent of the liability of the tutor as secured by mortgage. In this case the rights of the minors as creditors of the community are so interconnected with the property rights involved that they can not be dissevered.

If it be true that Zeigler during the lifetime of his wife received of her paraphernal funds the sum of thirty-two thousand dollars which he applied for the benefit of the community, that claim descended to the wife's heirs as part of her succession. If the evidence of that fact had been placed of record payments to the wife would have stood secured by the wife's mortgage on all his property. Had the husband qualified after the wife's death as tutor under these circumstances and he had registered an extract of inventory as required by law, these two facts would not have produced as their result a legal forced payment from himself as debtor to the wife to himself as tutor of the children, wiping out thereby the wife's mortgage and substituting in lieu of it the minors' mortgage and making payment to the children dependent upon and following the fate of the latter mortgage. The claim would remain still as a claim due to the wife and her heirs supported by the wife's mortgage. There would be no merger of the original claim into another claim from the facts stated. McCall vs. Mercier, 1 La. 347.

We do not think, however, that when a father has made a surrender of his property, and has placed all the different pieces of community property on his schedule, declaring that he surrendered an undivided half interest therein, that his minor children, keeping out of the insolvent proceedings the interest they may have, in the community, can insist that the undivided interest of the father in each of these specific pieces of property should be sold, and that they should come directly against the proceeds of that particular portion or

interest in the community property, and apply them, by preference, to the payment of their community claim. The character of the interest they have in the community is the same as that of their father. Their ultimate rights as owners and as creditors are to be determined by a general liquidation of the community.

This liquidation can not be operated by making a comparison, at any given date, of the community property with the amount of a claim due by the community to the wife's heirs, and assuming upon this comparison's showing that the community claim exceeded the value of the entire property (or of one-half thereof), that, therefore, and as resulting from that fact the wife's heirs became vested in the ownership of either the whole community property or one-half thereof. The legal title could not shift by a mere comparison of values. In order to bring about such a result there would be required some direct act by and from which there should be made a transfer. The creditors should have the right to have these estimates of value tested as to their correctness by actual judicial sales, and the *residuum* of the parties legally determined. We are of the opinion that, where the wife having died, the community is the owner of numerous pieces of property and there are also community creditors (among them the heirs of the wife), and the community has never been settled, that the husband, when he goes into insolvency, must surrender the community property in its entirety, and so return it, and in classifying his creditors, must classify them into community and separate creditors—that the community should be sold separately and distinct from the separate property and the proceeds accounted for according to the rights of parties. We think the proceeding should be assimilated to the case of the community rights opened by the prior death of the husband, in which case the community is liquidated inside of the husband's succession—and, therefore, that the community, in case of a cession, should be settled inside of the insolvency. Any other course would give rise to interminable difficulties. The law has not provided a method for the settlement of the community upon the death of the wife, and the method of making this settlement and determining the rights of parties has been, and is still, a most embarrassing one to dispose of.

With reference to the claim set up by the children against their father, resulting from the tutorship itself, which the District Court

recognizes as one supported by a general mortgage in full force and covering all the property of the husband from the date of the recording in the books of the Recorders of Bossier and Caddo parishes of the extract of inventory referred to, we are constrained to differ from our learned brother, reluctant as we are to do so in view of the great wrong and injury which may result to the minors.

We find in the record under date of July, 1887, a judgment of the District Court of Caddo parish, authorizing S. J. Zeigler, as natural tutor of his minor children, to execute a special mortgage in favor of his minor children, on certain designated property in lieu of the general mortgage then existing against him as tutor, and decreeing " that said special mortgage, when duly approved, accepted and recorded, shall operate as and authorize the cancellation in full of said general mortgage and prior special mortgages now existing against him as tutor in favor of the said minors." We find in the record a special mortgage executed by Zeigler under said order or judgment approved and accepted by the District Judge and recorded, followed by a cancellation of the general mortgage upon the books of the recorders of the parishes of Bossier and Caddo. We find that this judgment or order of court was based upon proceedings of a family meeting ordered to be convened and convened under an order of the District Court upon the application of S. J. Zeigler to consider the application made by him to authorize him to execute such special mortgage in lieu of the general mortgage. That to that family meeting was submitted Zeigler's application, and that said family meeting declared that the property offered to be specially mortgaged "was of sufficient value to secure the rights of the minors in principal and interest"—that they recommended that " the tutor be authorized to execute a special mortgage on the property for seventeen thousand three hundred and seventy-one dollars, being twenty-five per cent. above the amount due the minors, as shown by the account filed by the tutor that day, said mortgage to stand in place of the general mortgage on said tutor's property, resulting from registry of extract of inventory in said tutorship, and also in place of a special mortgage then resting on the lands in Bossier parish, purchased by the tutor from Mrs. Stockwell."

We find that the under-tutor, though not present at the meeting, subsequently approved and signed the proceedings.

We find a report of experts appointed under Art. 331 of the Civil

12

Code, appraising at twenty-five thousand dollars the property offered to be specially mortgaged.

We find that on the same day that the family meeting was convened Zeigler filed what he styled his first annual account as tutor with the minors. In this account he charges himself up with the value of the real estate, as shown by the various succession inventories with personal property on hand, and as having received, cash, rents and accounts, ten thousand seven hundred and eighty-three dollars, the whole amounting to seventy-one thousand eight hundred and thirteen dollars. He then credited himself with the same properties *plus* a number of bills paid by him and expenses of the minors for two years, two thousand dollars, the whole amount by the account to sixty.eight thousand two hundred and fifteen dollars and fifty-nlne cents. Deducting one amount from the other he charged himself with having on hand at that time, and due the minors, three thyusand five hundred and ninety-seven dollars and ninety-one cents.

No allusion is made to any amount as being due to his wife, nor is there any attempt to show the general ultimate condition and situation of the community or the succession.

There was a reference in the proceedings of the family meeting to an account of tutorship as having been filed that day, which we presume was the one we have just given out. There was no reference to the report of experts.

The attack made by the minors upon these proceedings, it will be seen, declares them absolute nullities, for the reason that only a small part of the property mortgaged belonged to Zeigler, the balance belonging to the minors themselves. In the brief in their behalf it is claimed that " there was no real prior liquidation made according to law ascertaining the amount due the minors, also that there is a discrepancy in the amount for which the special mortgage was given (seventeen thousand dollars), and that stated to be due to the minors (three thousand five hundred and ninety-seven dollars). It is claimed that any one looking at the proceedings and the acts would see at once there was error somewhere, and should have been placed upon guard and inquiry. The utterly insufficient protection given to the minors through this special mortgage is pressed upon us, it being asserted that the amount presently due by the tutor to his minors, interest included, amounts to sixty-seven thousand dollars.

If this be true and the minors' security for the acts of the tutorship are made to depend upon the mortgages affecting the property specially mortgaged, there is no doubt the minors will have suffered a grievous wrong through the carelessness, indifference, ignorance or want of judgment of those controlling their interests and their fortune, but the question is, has this court any power to correct it as matters stand, if at all, or under any circumstances?

The syndics claim that the proceedings in question are not absolute nullities; that they must have effect until set aside; that the minors have not attempted to do so, but have ignored them, and are acting in this proceeding as if they had never existed; that they can not be thus collaterally disposed of and on an opposition to an account. They cite in behalf of this position Graham vs. Hester, 15 An. 148; Holmes vs. Dabbs, 15 An. 501; In re Routon, 11 An. 621; Succession of Anger, 38 An. 492.

They contend that even if they be wrong in this respect that the judgment in this case could only be one dismissing the demand, because there is no legal evidence that opponents are creditors in any amount of the insolvent. That neither the community claim of the minors nor their tutorship claim is established; that before proceeding as they have done they should have had a judgment against their father and tutor; citing Elizabeth Gibbs et al. vs. Joseph A. Lum & Co., 29 An. 526; and Successions of William E. Edwards and Lavinia Wilson, 32 An. 457. That they have no judgment against their father and mother, and come before us resting solely upon his uncorroborated extra-judicial acknowledgments of indebtedness and his uncorroborated testimony to the same effect. That they are seeking to obtain really in the present proceeding, for the first time, a judgment in their favor. They claim that a mere agreement between Zeigler and his children as to his being indebted to them in a certain amount does not furnish a legal cause for the action taken by the minors. That the minors themselves have been emancipated only by notarial act, and are not authorized to accept extra-judicial accounts from their tutor.

We think that opponents have not established with sufficient certainty the claim which they advance as for paraphernal moneys of their mother received by their father and applied to the benefit of the community, and that we are not at present justified in recognizing them as creditors of the community from the amount claimed paya-

ble by preference out of the community over separate creditors of their father.

We think it is useless to pass upon these particular objections, as we are satisfied from an examination of the proceedings that even if this particular claim of opponents were supported by a judgment to its full extent, and even if the attack they now make were made in form other than that which it has taken, it would fail certainly as against parties holding mortgages on the property. We find the proceedings of a character such as to justify the public dealing with Zeigler to have supposed that his property other than that specially mortgaged was free from mortgage. In Barnard vs. Ewin, 2 Rob. 407, this court said: "That as soon as the special mortgage is accepted and recorded the general mortgage resulting from the tutorship ceases to exist as to third persons, and the mass of the property will be released even though an error may have been committed in ascertaining the amount due to the minor at the time of executing the special mortgage.

In Casanova's Heirs vs. Avegno, 9 La. 196, this court concurred with the District Court in announcing as law that, where a person desirous of purchasing property from a tutor is bound to inquire how the rights of the minors are secured; if he find that these rights are secured by a special mortgage he is justified in concluding that the general mortgage in favor of the minors has ceased to exist, especially when recurring to the Court of Probates he finds that the special mortgage has been accepted by a family meeting and by the court, and that it is on the responsibility of the under-tutor and family meeting the special mortgage is accepted; once accepted and recorded the general mortgage resulting from the general mortgage ceases to exist with regard to third persons (on other property.)

In Pierce vs. McMahon, 15 La. 218, it was declared that where the tutor observes all the forms required by the act of 1830, authorizing a special mortgage to be substituted in lieu of the general one resulting from the tutorship, it frees the other property from all encumbrances, and a purchaser can not set it up in avoidance of the sale. That if the minor, having attained the age of majority, were to seek to enforce his legal mortgage, he might be answered that by a judgment of a competent tribunal in a proceeding in which he was duly represented the general mortgage had been waived and a

special one substituted in its place.   That whether it was regarded as a contract or a judicial proceeding, it was equally conclusive upon the minor, all the forms required having been observed under the personal responsibility of the under-tutor.   That act expressly renders the under-tutor liable personally to the minor in case of the inefficiency of the new security, unless he make opposition and his opposition is overruled.

In Golding vs. Golding, 43 An. 555, the court said: "When the legal mortgage in favor of a minor on the property of the tutor has been canceled and erased from the records by the final decree of the court seized with jurisdiction thereof in proceedings regular on their face, and with the advice and consent of a family meeting a special mortgage has been substituted therefor, subsequent purchasers in good faith of the property will be protected, and can not be affected by charges of fraud and conspiracy in the proceedings to which they were not parties and of which they were ignorant."

It has been repeatedly held that though third persons acting under orders of court must look to the jurisdiction of the court, the truth of the record concerning matters within its jurisdiction can not be disputed.   Bissel et ux. vs. Irwin's Heirs, 14 La. 146; Ball's Administratrix vs. Ball et al., 15 La. 182; Brosnahan et al. vs. Turner, 16 La. 440; Rhodes et al. vs. The Union Bank of Louisiana; Gray vs. Lowe, 7 An. 468; W. Shaffet et als. vs. James C. Jackson et als., 14 An. 154; Succession of John Gurney, 14 An. 622; Succession of Antoine Hebrard, 18 An. 485; Eleanor W. Woods et al. vs. Hilliard H. Lee et als., 21 An. 505; Susan A. Webb vs. Amelia E. Keller, 26 An. 596; Mrs. Nancy M. Fraser vs. Zyliez, 29 An. 536; Heirs of Herriman vs. Janney, 31 An. 280; Heirs of Thomas Nesom vs. Julius Weis et al., 34 An. 1004; Beulah Webb, Wife, et al., vs. Amelia Keller et al., 39 An. 55.

In M. D. C. Cane, Tutrix, et al., vs. J. D. Cawthon, Sheriff, et al., 32 An. 953, this court said: " There can be no dispute at this day as to the entire correctness of the proposition that persons dealing bona fide are protected by final decrees rendered by courts having jurisdiction of the persons and subject matter before them, and this whether said judgment be right or wrong, honest or fraudulent. See 32 An. 953.

In the Succession of Elliott, 31 An. 31, the court said a mortgage creditor was not permitted to take advantage of the substitution of

a special mortgage in lieu of the minors' general mortgage, based upon a fraudulent account which had been homologated, though the general mortgage had been raised by the court upon the advice of a family meeting; but it is obvious that it was because the particular creditor was considered as having had knowledge of the fraud and not in good faith.

We are of the opinion that the judgment of the District Court authorizing the erasure of the minors' general mortgage, followed as it was by the erasure of the same from the mortgage records, still stands in full force and effect as to all third persons and must continue to stand—the tutorship having now terminated and all the property of the tutor having been surrendered to his creditors, and that the judgment below recognizing the general mortgage of the minors' mortgage on all of the property of the tutor from the date of the recording of the extract of inventory is erroneous, and that that mortgage must be restricted to the property specially mortgaged by Zeigler to secure any amount which he may owe as tutor to the minors. We are of the opinion that the extent of the indebtedness of the tutor has not been sufficiently shown.

The syndics in their brief call our attention to the fact that upon the extract of inventory on the faith of the registry of which the general mortgage upon all the property of the tutor is claimed the name of S. J. Zeigler does not appear, and, as resulting from that fact it is claimed that the recording of said extracts do not inform the public that any mortgage existed in favor of opponents on the property of a "person named" and the recording is inoperative. Ford vs. Tilden, 7 An. 533; W. S. Donnell et als. vs. E. Gant et als., 24 An. 189; Ernest J. Smith vs. Miss Lizzie Lewis, 45 An. 1457, are relied upon in support of this position.

The extracts recorded in Caddo were as follows:

In District Court of Caddo.

Tutorship of Minors \
Sallie Vance Zeigler. / No. 1814.

I hereby certify that the inventory taken in the above named tutorship in Caddo parish shows the appraised value of said property sixty-three thousand four hundred and twenty-eight dollars and eight cents ($63,428.08).

Given under our hand and seal this 11th day of May, 1885.

(Signed)                                    W. P. FORD,
        Clerk and Ex-Officio Recorder and Notary Public.

The certificate as to the value of the Bossier property was similar, in every respect, to that of Caddo parish, the amount being thirty-five thousand and fifteen dollars.

Upon the margin of each certificate of the record book in Caddo parish seems to have been written the following:

(Endorsed) Canceled by special mortgage substituted. Recorded in Mortgage Book " R," page 70, June 30, 1888.

W. G. BONEY,
*Deputy Clerk and Ex-Officio Deputy Recorder, Bossier Parish.*

The same certificates were placed of record in Bossier parish. On he margin of the Bossier certificates we find the following entry:

CANCELLATION.

" STATE OF LOUISIANA, }
" Parish of Caddo. }

" By reason of the registry of the special mortgage executed by S. J. Zeigler, natural tutor of the minors of Sallie Vance Zeigler, deceased, recorded on pages 512 and 516, inclusive, of Vol. " J " of Mortgages, in lieu of the general mortgage existing against him as natural tutor, by authorization of the judge of the First Judicial District of Louisiana, I hereby cancel this legal mortgage in full.

" Done officially on this the 13th of July, A. D. 1887.

(Signed)                                        ".J. H. CABEEN,
" *Deputy Clerk and Ex-Officio Deputy Recorder, Bossier Parish.*

Counsel of the minors contend that the marginal entries showing the cancellation of the general mortgage indicates the party who was the tutor of the minors, and cures any defect in the original entries. The Bossier parish marginal note of cancellation is much fuller than that of Caddo parish, the latter referring simply to a special mortgage having been given in lieu of the general mortgage, and indicating in what record that mortgage could be found.

Appellants claim that the minors who contend that the special mortgage was as to them absolutely null, and void, should not be permitted to contend at the same time that such mortgage is effective in their favor as against third persons. If in point of fact and law the marginal entries sufficed to perfect the original record of the certificates upon the mortgage books there would be no inconsistency in the minors taking advantage of that fact. An act bad for one purpose may be good for another.

The question comes back to ascertaining what effect these marginal entries had. Did the mention in the Bossier records of the name of S. J. Zeigler as being the tutor of the minors of Sallie Vance Zeigler made for the first time in an entry of the recorder, showing a simultaneous cancellation of the general mortgage under order of court, convey such notice and give such effect to the original record of the certificates as to make them good and efficacious under the law from that time forward, as if the name of Zeigler as tutor had appeared originally in the records? We think not. The marginal note is no part of the extract of inventory filed. It is upon the instruments themselves which are recorded and as recorded by which the rights of parties are to be rested?

### ON THE OPPOSITION OF THE MERCHANTS AND FARMERS BANK OF SHREVEPORT.

S. J. Zeigler specially mortgaged to secure his minor children nineteen-sixty-fourths of an undivided one-eighth, and eighty-three-one hundred and twenty-eighths of an undivided one-half of the Haynes plantation to secure the payment of seventeen thousand dollars. Subsequently, one of the joint owners, Nancy J. Mitchell, instituted a suit for a partition against the other joint owners, including the minors who were represented, and obtained a decree for a sale of the entire property to effect a partition by licitation. At the sale S. J. Zeigler became the purchaser. It is claimed that the effect of the sale was to extinguish the mortgages and transfer the mortgage rights to the proceeds. The purchase of the property by one of the joint owners, upon whose share rested a mortgage in favor of his minor children as tutor, left the minors' mortgage rights intact on his actual original interest in the property. LeCarpentier vs. LeCarpentier, 5 An. 497; Life Association of America vs. Hall, 33 An. 49.

For the reasons herein assigned, it is ordered, adjudged and decreed that the judgment of the District Court, recognizing Mrs. M. F. Smith as entitled to four hundred dollars for attorney's fees be and the same is affirmed; but that the judgment of said court, arresting interest upon her mortgage claim from the date of the sale of the property mortgaged be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that she is entitled to interest thereon until final payment.

Zeigler vs. His Creditors.

It is further ordered, adjudged and decreed that the judgment appealed from, rendered upon the opposition of the First National Bank of Shreveport, rejecting the demand of said bank; that the notes, of which it declared itself the holder and owner in said opposition, be declared secured as to payment (subject to the partial payment made thereon) of principal, interest and attorney's fees by special mortgage and vendor's privilege on fractional block 64 of the city of Shreveport, and upon the buildings and improvements thereon, be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that said notes (subject to the partial payment therein admitted in the pleadings), together with interest and attorney's fees, be and the same are recognized as secured by special mortgage and vendor's privilege on fractional block 64 in the city of Shreveport, and upon the buildings and improvements thereon.

It is ordered, adjudged and decreed that the "Plain Dealing plantation," described and referred to in the opposition of George E. Gilmer, under-tutor of the minors Mary Lee and Vinnie Zeigler, be and the same is the property of the said minors in its entirety, the interest therein which S. J. Zeigler held at one time under the will of his wife, Sallie Vance, and under and by inheritance from his children Susie and Sadie Zeigler, having vested in the said Mary Lee and Vinnie Zeigler by reason of the second marriage of S. J. Zeigler and by reason of their inheritance from their sisters Susie and Sadie Zeigler, who died intestate without issue, free from all mortgages and encumbrances placed thereon by S. J. Zeigler, and regardless of all transfers made by him.

It is further ordered, adjudged and decreed that S. J. Zeigler is the owner in its entirety of the "Haynes lands" or "Haynes plantation" described in the pl adings, but that the mortgage of the minors, as it stood at the time of the partition of said property instituted by Nancy J. Mitchell, remained unaffected by said partition and the sale herein made.

It is further ordered, adjudged and decreed that the interest of S. J. Zeigler in lots Nos. 9, 10, 11 and 12 in Block 62, in Shreveport, is limited to his community interest therein in the community which existed between himself and his deceased wife, Mary Lee and Vinnie Zeigler, his children having an equal and similar interest in the same.

It is further ordered, adjudged and decreed that the interest of S. J. Zeigler in the lot in the town of Benton, containing three acres— the lot in the town of Benton containing one acre—in the lands known as the "Lewis lands"—in the lands known as the "Dutch John Hill lands," and in section 28, township 20, range 13 east, in Bossier parish, all described in the pleadings, is limited to his community interest in the community interest acquired in and to said property—Mary Lee and Vinnie Zeigler, his children, having an equal similar interest therein and thereto.

It is further ordered, adjudged and decreed that the judgment appealed from recognizing and decreeing as being still operative and in full force the general mortgage in favor of the minor children in issue of the marriage of S. J. Zeigler with his wife, Sallie E. Vance, upon all the property of S. J. Zeigler by reason of his tutorship of said minors, dating from the date of the recording in the mortgage books of extracts of inventory. ("In the matter of the tutorship of the minors Sallie Vance Zeigler"), regardless of the raising, under judgment of court, of said general mortgage upon all the property of said Zeigler other than upon the property authorized by said judgment to be specially mortgaged to secure the rights of said minors, be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that the rights of said minors against the said S. J. Zeigler and his property as resulting from his tutorship be restricted to the general and special mortgage in their favor on the property authorized to be specially mortgaged and specially mortgaged in their favor. It is further recognized that any community indebtedness which may be due by the community between S. J. Zeigler and Sallie E. Vance to the minors Mary Lee and Vinnie Zeigler by reason of paraphernal funds of their mother. Sallie E. Vance, having been received by their father S. J. Zeigler and applied to the benefit of said community, is entitled to be paid out of the proceeds of the sales of the mass of the community property by preference over S. J. Zeigler or any separate creditor or creditors of the said Zeigler. The amount of the indebtedness claimed by the minors Mary Lee Zeigler and Vinnie Zeigler against their tutor, S. J. Zeigler, and that claimed by them as being due to them by the said community having not been satisfactorily established, the judgment of the District Court in their favor for fixed amounts and ordering them to be presently paid by preference out

of the community property and the property struck by the tutorship mortgage in their favor is hereby annulled, avoided and reversed and this cause is remanded for the purpose of fixing the same, with leave on their part to amend their pleadings.

It is further recognized that the syndics' cession of S. J. Zeigler brought into the insolvency the community property of the community between S. J. Zeigler and his wife Sallie E. Vance in its entirety, and it is ordered that the said community be liquidated and settled inside of the said insolvency according to law and the rights of parties.

It is further ordered, adjudged and decreed that the judgment of the District Court, in so far as it conflicts with the views herein expressed, be and the same is annulled, avoided and reversed, but otherwise it stands affirmed.

It is further ordered that the syndics recast their entire account and make the same conform to the views herein expressed and the judgment herein rendered.

## ON APPLICATION FOR REHEARING.

MILLER, J.    It is insisted on the argument for the rehearing that under our law there is no legal subrogation in favor of the ordinary creditor who pays the mortgage creditor of the common debtor. The cases cited, that the stranger, i. e., not bound, or with no intent in discharging the debt, acquires no right of the creditor by paying it, are familiar. Curtis vs. Kitchen, 8 Martin, 706; Chalmers vs. Stow, 3 N. S. 310; Nolte vs. Their Creditors, 6 N. S. 175; Nicholls vs. His Creditors, 9 Rob. 476; Shaw vs. Grant, 13 An. 52, and others of similar type. It may be that in some of these cases the party making the payment was an ordinary creditor of the debtor. But it is quite certain that in none was the subrogation contended for on the ground that the party claiming the subrogation was a creditor of the debtor. The only case in which we find discussed the right of the ordinary creditor to the mortgage of the creditor, whose debt the ordinary creditor discharges, is that in 42 An., where the right was conceded, but denied, on the ground peculiar to that case stated in the opinion. So much for the aid afforded by our jurisprudence.

While there is some variance in the French authorities on this question, it must be conceded, we think, that the subrogation of the

ordinary creditor, acquired by his payment of the mortgage creditor, is put beyond controversy. The theory of this subrogation is, that the creditor of inferior rank, in making the payment to the mortgnge creditor, has an interest in the property of the common debtor, the pledge of both creditors. Until the superior mortgage debt is diacharged, the creditor of inferior rank gets nothing. He is concerned, therefore, in making that payment of the superior debt which prevents a sacrifice of the common pledge, and affords the creditor who makes the payment the opportunity to make the property bring enough to pay and leave a surplus after the superior debt is satisfied. The whole reasoning on which this legal subrogation rests, points to the ordinary creditor as entitled to it, and excludes the contention that the legal subrogation is restricted to the second or third mortgage creditor who pays the debt secured by the elder mortgage. The reason of the subrogation in favor of the creditor whose mortgage is inferior exists, we think, with equal if not greater force in favor of the ordinary creditor whose payment stops the sacrifice of the property under the writ of the superior creditor. In Boileux, Toullier, Marcadé and others of the French commentators, we find the most emphatic recognition of this subrogation of the ordinary creditors. In Dalloz Codes Annotés, the first paragraph that strikes the eye in connection with Art. 1251 of the Napoleon Code, corresponding with that of our Code 2160 on the subject, is the affirmauce of the legal subrogation arising from the payment of the mortgage debt by the ordinary creditor. After all, on this question, is not the Code itself enough? Its conciseness of expression that subrogation takes place in favor of the creditor who pays another whose debt is preferable by reason of his privilege or mortgage, would certainly seem to preclude any aid for interpretation. We think reason and authority, as well as the text of the Code, sustains our opinion that gives the bank in this case, the creditor of Zeigler, the subrogation to that mortgage securing the debt the bank discharged. Napoleon Code, Art. 1251; 4th Boilleux, p. 544; Marcadé, p. 585; Civil Code, Art. 2160; 1st Dalloz Les Codes Annotés, p. 1070, paragraphs Nos. 5 et seq.

It is, however, claimed that with all the facts spread before us in this record, conferring on the bank this legal subrogation, the bank is to be denied the right, because in its opposition the bank claimed ownership by purchase of the notes, and hence can not claim own-

ership by subrogation. Payment to the mortgage creditor is the inci-
dent both of purchase and subrogation.   The accounts of the bank
with Zeigler wese the subject of examination by both parties in the
lower court, and that the bank was Zeigler's creditor when it paid
the mortgage debt  was proved and conceded.   In the development
of this proof and the payment by the bank, its legal subrogation, if
our view of the law is correct, is conclusively shown and is patent
on this record.   Can we deny the legal subrogation because the bank
calls it a purchase?   We have knowledge that it has been held that
a party claiming ownership and failing in that contention, can not
contend for a privileged debt.   Such relief would be *ultra petitum*.
We are apprised, too, that it has been held that on a rehearing the
party can not ask recognition of a title not contended for before,
and in one of the cases actually repudiated in the original argument.
Nugent vs. Buisson, 35 An. 108; Silbernagel & Co. vs. Baker, 23 An.
699; Weil vs. Ginnery Co., 42 An. 492.   We find in this case no
such difficulties as presented themselves in the cases cited.   The
bank proved all the facts requisite for the subrogation, claimed it on
the original argument, and it was allowed on our original opinion.
Our courts have never been inclined to deprive the litigant of
rights, because in supporting the title he asserts, there is some
variance between the method of acquisition alleged and that proved,
the proof tending to sustain the substantial issue, *i. e.*, title, and
conforming with and not exceeding the demand.   It is true, in this
class of cases, or in some of them. at least, the fact of no objection
interposed to the testimony has had its influence.   In this case no
objection on the ground of variance was made.   But irrespective of
that, in our view, when the testimony adduced to sustain the title
alleged exhibits only the variance from that alleged as to the mode
of acquiring title, we must give effect to the testimony.   Bryan and
Wife vs. Heirs of Moore, 11 M. 26; Langline and Wife vs. Broussard,
12 Martin, 242; Powell vs. Aiken & Gwinn,  18 La. 328; Nichols vs.
Morgan, 9 An. 534.

Our re-examination of this case, however, leads to the conclusion
that Zeigler is entitled to the credit of five hundred and fifty-three
dollars and five cents, of date the 2d March, 1892.   The credit accrued
after the notes were given, and we can perceive no reason why it
should not be allowed.

It is therefore ordered, adjudged and decreed that our former

judgment remain undisturbed, with this modification, that Zeigler be and he is hereby allowed a credit on the mortgage notes, the subject of opponent's opposition, of five hundred and fifty-three dollars and five cents, of date the 2d March, 1892, with interest from that date.