(38 South. 424.)

No. 15,483.

## HAYWARD et al. v. HAYWARD et al.*

(March 13, 1905.)

MORTGAGE—CONSTRUCTION—ATTORNEY'S FEES.

Where, by the terms of an act of mortgage, the mortgagor agrees that, in the event of the nonpayment at maturity of the note to secure which the mortgage is given, he will pay and reimburse all such attorney's fees as the mortgagee may "incur or pay," the obligation so assumed becomes part of the debt due by the mortgagor whenever, by reason of his failure to pay the note at maturity, it becomes necessary for the mortgagee to employ an attorney, and thereby to incur liability for a fee; and where, by reason of the refusal of the mortgagor to recognize such obligation, the mortgagee, through his attorney, opposes the distribution of the proceeds of the mortgaged property, sold to effect a partition, and claims the whole amount of the debt, the opposition is a "suit," within the meaning of a stipulation in the act of mortgage to the effect that the attorney's fees shall be fixed at 5 per cent. of the amount sued for.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; John St. Paul, Judge.

Action by W. B. Hayward and others against Jack Moore Hayward. Judgment for plaintiffs in partition, and Peter Labouisse and others appear by way of intervention and third opposition. From the judgment, defendant and Peter Labouisse appeal. Affirmed.

Clegg & Quintero, Fenner, Henderson & Fenner, and William McLellan Fayssoux, for appellants. Harry Hinckley Hall and Omer Villeré, for appellee Morgan.

### Statement.

MONROE, J. Certain heavily mortgaged real estate in New Orleans having been sold in the above-entitled partition proceeding, the mortgage creditors, Peter Labouisse and Mrs. Edith Labouisse Eno, wife of Henry Lane Eno, appeared by way of intervention and third opposition, and claimed part of

---

*Rehearing denied April 10, 1905.

the proceeds, in satisfaction of the debt due them; the matter really in dispute being the question of their attorney's fees. There was judgment in favor of the opponents, and the other litigants have appealed. The facts, as we find them from the evidence in the record, are as follows: In May, 1895, the owners mortgaged the property mentioned for a total of $85,000, represented by two notes of $50,000 and $35,000, respectively, payable in one year, and bearing interest (as subsequently reduced) at the rate of 6 per cent. per annum; the two acts of mortgage containing, inter alia, the following stipulations, to wit:

"That the said mortgagors further declared that they * * * consent * * * that, in the event of the said promissory note not being punctually paid at maturity, it shall be lawful for * * * the said mortgagee * * * to cause * * * the said * * * mortgaged property to be seized and sold under executory process, * * * hereby confessing judgment, in favor of said mortgagee and such person, or persons, as may be the holder * * * of said promissory note, for the full amount thereof, capital and interest together with all premiums of insurance, attorney's fees and legal costs and charges herein stipulated. And the said mortgagors further bind and obligate themselves * * * to pay and reimburse unto the said mortgagee * * * all such * * * attorney's fees, together with all such costs, charges and expenses as said mortgagee * * * shall, or may, incur, or pay, in the event of the nonpayment of said promissory note at maturity; said attorney's fees, however, to be fixed at 5% on the amount sued for."

The notes were not paid at maturity, and the mortgagees employed an attorney, who advised, and for more than five years continued to advise, them as to the course to be pursued. From considerations of personal friendship toward the mortgagors, and also, perhaps, because they were advised that the property was not likely, if sold, to realize the amount of their claim, the mortgagees did not, during the period mentioned, insist upon taking legal proceedings, though in 1899 the mortgagors ceased to pay interest on the notes.

In 1904 the debt, including principal and interest, and not including attorney's fees,

had attained such proportions that the mortgagees decided that it was necessary for them to insist upon a settlement, and, with a view to the issuance of a writ of seizure and sale, their attorney made a special arrangement with the sheriff as to the commission to be charged by him. For the reasons which have been stated, however, there was still a reluctance to proceed in that way, and the negotiations between the parties, in which the mortgagees were represented or advised by their attorney, resulted in an agreement (the finality of which depended on the action of a family meeting to be convened on behalf of a minor mortgagor) to the effect that the mortgaged property should be given to the mortgagees in payment of their debt, and, as it was not believed that the property was worth in the market the amount due, that there should also be given to them the sum of $7,000 cash, of which $6,000 represented the rental of the property for the year then about expiring, and $1,000 was to have been contributed by one of the mortgagors out of his own pocket. Two of the members of the family meeting convened pursuant to this agreement were, however, of the opinion that it would be advisable, in the interest of the minor, to offer the property at public sale; and, in deference to their views, the proposition was made to the mortgagees that an order of sale should be obtained in a partition proceeding, and that they should bid in the property, and, in the event of its not selling for the amount due them, that they should receive the additional $7,000 in cash, as already agreed; the consensus of opinion among the parties interested being (with the exception of the two members of the family meeting who have been mentioned) that the property would not bring the amount of the mortgage debt. There is some little difference between the participants as to the precise language used in the making and acceptance of this proposition, but the main difference lies

in the interpretation or application of the language. The proposition was made by J. D. Hayward and Sam Henderson, his attorney, representing the mortgagors, to Peter Labouisse, acting for himself and for Mrs. Eno. Mr. Hayward gives the following with other testimony concerning the interview, to wit:

"The agreement was that Mr. Labouisse would consent to our putting the property up for sale at public auction, and that, if he bought in the property for anything else than the face of the notes and accumulated interest, he would take the property over, just as if we transferred it to him; and, if it brought any more than that, of course, it would go to the estate. * * * Q. Did he state that? A. We stated that to Mr. Labouisse—any surplus, over and above what we owed him would go to the estate. * * * Q. Did he assent to that? A. He didn't dissent. He said: 'You are to pay all the expenses if I buy the property in. You are to pay me the rental from the 1st of September, with $1,000 extra, which I agree to.' * * * By the Court: There is one thing I want to get through my mind, and that is whether, in the contemplation of the parties at that time, Mr. Labouisse was to come out whole, and if there was to be any advantage given, which should go to you, or was it a question of a fixed amount that you were to pay him? A. It was—that Mr. Labouisse should come out whole, and, if there was any surplus, it should go to the estate. By Mr. Clegg, counsel for the mortgagors: Q. What do you mean by 'whole'—Mr. Labouisse coming out whole? A. That he should be paid the face of his notes, with accumulated interest. * * * By Mr. Hall (counsel for mortgagees): Q. I understand that it was agreed by all parties that the property should be turned over to the Labouisse heirs in full payment of all obligations due by the mortgage creditors, the Haywards, and, over and above that, you were to pay $7,000? A. Yes; in other words, I was to be the lessee of the property from Mr. Labouisse. Q. In other words, if you had carried out that agreement, by act [aid] of a family meeting, they would have had the property and $7,000 in cash. A. Yes, sir. Q. At that stage you went to them and asked to be permitted to sell the property at public sale in the partition proceeding? A. Yes, sir; I did, at the suggestion of the family meeting. Q. You asked Mr. Labouisse, as a concession, and he, after consulting his lawyer, and sister, probably, consented to that? A. No, sir; he didn't have time. He was at the Boston Club. Q. He said he had no objection? Yes, sir. Q. With the understanding that, if the property brought less than the amount of the mortgage, he would buy it in, and you would still pay him $7,000? A. Yes, sir. Q. And the expenses of the sale? A. Yes, sir. Q. In any of that conversation, was any-

thing said by any of you about attorney's fees? A. No, sir. Q. None of you ever dreamed that the property would realize more than the mortgage and interest? A. I didn't think it would bring that. Q. Was anything ever said by Mr. Morgan [the mortgagees' then attorney] or Mr. Labouisse with [regard to] the intention of remitting these attorney's fees, or paying them out of their own pockets? A. It was never discussed. Q. Then, as a matter of fact, if they had taken over that property, and had then put it up for sale, and sold it as advantageously as it was sold, they would have received $133,000? A. Yes, sir. Q. And if they had bought it in besides, they would have received $7,000? A. Yes, sir. Q. And as it is now they have received the amount and interest of their debt, and are burdened with the attorney's fees of $5,000? A. I can't say that. By the Court: Q. Has Mr. Morgan been dealing with you from the time that he said he had the notes—five years? A. Yes, sir; I have talked with him very frequently. Q. He states that he has had them in his hands for some five years. Is that correct? A. Oh, yes; I guess so. Q. That is your understanding? A. Yes, sir. Q. You were dealing with Mr. Morgan during that time? A. Yes, sir; and with Mr. Labouisse also. Mr. Morgan and Mr. Labouisse would both see me. I think I wrote a dozen letters or more."

Mr. Henderson testifies that he told Mr. Labouisse that Mr. Hayward would pay the cost of the sale, as had been originally contemplated; that Labouisse asked Hayward about the rent, and that the latter replied that it would be paid, as previously agreed; and that Labouisse said:

"All right. Go ahead. I will agree to that." On being recalled he testifies, somewhat more specifically, as follows: "After telling Mr. Labouisse what we proposed to do—stating that, if he bought the property in for less than the amount of his debt, Mr. Hayward would pay the rental—I said, 'If the property sells for an amount more than your debt, principal and interest, you have nothing to do with the balance; if it brings less, you take the property.' He said, 'Yes; I will do that;' and he said, 'How about the rent?' and Mr. Hayward said, 'I will pay that.' But there was nothing other than the debt itself, with interest, mentioned. * * * Q. Did you have any attorney's fees in your mind at the meeting at the Boston Club? A. I did not. I had a positive agreement with him as to what he was willing to accept. I frankly say I did not think [have] that in my mind. Q. However, Mr. Henderson, you are not prepared to say that Mr. Labouisse ever made an agreement in which attorney's fees were mentioned in any way? A. No, sir; Mr. Labouisse never made such an agreement, but he did make such an agreement which I thought would debar him from collecting attorney's fees,

although they were not contemplated or discussed."

Mr. Labouisse's version of the matter is as follows:

"Mr. Hayward told me * * * that he would come to the Boston Club after the [family] meeting and let me know the result, and he came there with Mr. Henderson, and said that there was a misunderstanding, and that they could not come to any agreement to transfer the property. So they suggested making this sale, and went on to explain, as they stated already, and they said then, 'We will pay all the expenses;' and I said, 'I won't agree to anything if it costs me anything at all in any way. I have got to get my full amount of money due on that mortgage;' and Mr. Henderson said, 'Well, we will do that.' I said, 'I will agree to that only on condition that it meets with Mr. Morgan's approval.' Q. Was anything said or any differentiation made about principal and interest? A. Not that I understand. Q. Was anything said that you were to remit any part of the attorney's fees or mortgage? A. No, sir; I always insisted on getting the full amount of the mortgage due me. Q. I understand Mr. Morgan was your attorney? A. Yes, sir. Q. And you consider you owe him this 5%? A. Yes, sir. Q. If you don't get this money from the deposit made out of the proceeds of the sale, will you pay it to him yourself? A. Of course. Q. Was anything ever intimated by anybody to you, looking to or intimating that you were to bear the burden of your attorney's fees in these proceedings? A. No, sir. Q. Would you have allowed the property to be sold, and paid your own attorney's fees? A. No, sir; I never agreed to that. * * * Q. Had you any reason for not foreclosing on the property? A. No, sir."

Pursuant to the agreement to which the witnesses have thus testified, an action in partition was instituted, and an order of court was obtained for the sale of the property, and for the convocation of a family meeting to fix the terms of the sale as to the interest of the minor. After the property had been advertised, the attorney of the mortgagees called attention to the facts that there had been no appraisement and that the family meeting had been illegally constituted, and, those matters having been rectified, the property was again advertised, with the names of the attorneys for the mortgagees and mortgagors appended to the advertisement (though by whose authority does not appear), and it was sold, to the surprise of every one concerned, for $133,000. The mortgagees thereupon demanded payment of the amount due them, including attorney's fees, but, although we find upon the face of the record the admission on behalf of the mortgagees, "We have no quarrel with Mr. Morgan; he is entitled to his fees," they (the mortgagors) denied that those fees should be paid by them, or from the proceeds of the mortgaged property. Hence this litigation.

## Opinion.

The mortgagors bound themselves to "pay and reimburse * * * all such * * * attorney's fees, together with all such costs, charges and expenses as" the mortgagees might "incur, or pay, in the event of the nonpayment" at maturity of the notes to secure which the mortgages were given. The notes were not paid at maturity, and it became necessary for the mortgagees to employ an attorney to protect their interest with respect to them. Neither the necessity nor the fact of such employment, nor the fact that the mortgagees thereby incurred a debt for fees, nor the amount of the debt so incurred, are disputed. If those fees are not paid from the proceeds of the mortgaged property, to which, by the terms of their contract, the mortgagees were entitled to look, they must be paid from the funds of the mortgagees, upon which, according to that contract, they were under no obligation to draw for that purpose. It is said, however, that as the result of the agreement whereby the mortgagees consented, for the accommodation of the mortgagors, that the property should be sold for the satisfaction of their claim in a particular proceeding, rather than under a writ of seizure and sale, they (the mortgagees) have debarred themselves from the right of recovery with respect to such fees; and this although it is admitted that, in the agreement relied on, attorney's fees "were not contemplated or discussed."

Considering together all the testimony which has been given concerning the agreement in question, it seems to us too plain to admit of discussion that the mortgagees were not asked to forego their right to collect any part of their claim, save in so far as the proceeds of the mortgaged property, plus the sum of $7,000 in cash, might fail to satisfy it. In other words, the mortgagees were asked to take the mortgaged property, plus the sum of $7,000, as in full of their demand, and to release the mortgagors from personal liability for anything beyond that, and they consented to nothing more. As matters stood at that time, the fees of their attorney, having been incurred by the mortgagees, formed part of the debt due by the mortgagors; and if the property had been adjudicated to the mortgagees for the amount of that debt, or less, the mortgagors would have been obliged to pay the additional sum of $7,000 in cash. As the property was sold to a third person for an amount largely in excess of the debt, the mortgagors are relieved of the obligation to pay the $7,000. There is, however, no reason why the full amount of the debt, including the fees, should not have been paid from the proceeds of the property, and, as the mortgagors refused to acquiesce in such payment, this suit became necessary, and was properly decided in favor of the interveners and third opponents. Mullan v. His Creditors, 39 La. Ann. 400, 2 South. 45; Succession of Duhé, 41 La. Ann. 209, 6 South. 502; Levy v. Beasley, 41 La. Ann. 834, 6 South. 630; Zeigler v. His Creditors, 49 La. Ann. 144, 21 South. 666; Abraham & Son v. N. O. Brewing Ass'n, 110 La. 1012, 35 South. 268. In the matter of the Succession of Foster, 51 La. Ann. 1671, 26 South. 568, it appeared that the act of mortgage imposed upon the mortgagors the obligation to pay attorney's fees in case it became necessary to resort to legal proceedings; and it was found by this court that no such necessity arose, and that no such

proceedings, within the meaning of the contract, were resorted to. In the instant case, as we have seen, the obligation on the part of the mortgagors to pay attorney's fees arose and became part of the debt when, by reason of the failure of the mortgagors to pay the mortgage notes at maturity, the mortgagees found it necessary to employ an attorney, and thereby incurred a liability for his fee, the amount of which was fixed, under the terms of the contract, by the filing of the intervention and third opposition claiming the whole amount due.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed at the costs of the appellants.